C.B.C. SUPER MARKETS, INC., TRANSFEROR, FRANK C. CICIO, TRANS-FEREE, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4999-67—5001-67. Filed April 28, 1970.

[1] Cases of the following petitioners are consolidated herewith: C.B.C. Super Markets, Inc., docket No. 5000-67; and Frank Cicio and Ann Cicio, docket No. 5001-67.

Frank C. Cicio, pro se.
*Rudolph F. Korbel*, for the respondent.

OPINION

*Deficiencies*

Four adjustments to petitioners' taxable income, two of which were made in the deficiency notices and the other two pleaded in respondent's answers, have been contested. The issues raised by these adjustments are purely factual.

First, respondent determined that for each of the years in issue both C.B.C. and Cicio had received unreported taxable income in the amounts by which the deposits in Cicio's two bank accounts, other than deposits identifiable as the proceeds of loans or tax refunds, exceeded his net reported income available for deposit. The theories

stated in the deficiency notices were that these deposits were taxable to C.B.C. as unreported income and to Cicio as constructive dividends.

Cicio has shown that, in addition to the nontaxable deposits identified by respondent, numerous other deposits of nontaxable funds were made in his accounts. Our findings disclose that Cicio borrowed substantial sums and deposited them in his checking account (No. 4490) with Manufacturers Trust Co. From this account he frequently withdrew funds which he advanced to C.B.C., either in cash or by paying bills on its behalf, and repayments by C.B.C. were later deposited in the account. In some instances Cicio was able to point to specific deposits in amounts corresponding with the loans. In other cases, he testified, repayments were evidenced by several deposits in smaller amounts. To support our conclusion that such repayments and deposits thereof were made before the end of the years in which the funds were advanced, consideration has been given to the absence of any accounts of indebtedness to Cicio on the balance sheets attached to C.B.C.'s returns, which were relied upon by respondent in the transferee proceeding.

Second, respondent disallowed all of the deductions claimed by C.B.C. for food purchases and delivery charges which were not supported by invoices, and determined that Cicio received constructive dividends from C.B.C. in corresponding amounts. Although Cicio disputed the revenue agent's treatment of transactions with Queens Dairy Farms, Inc., and Lee Foods, Inc., he furnished no substantial evidence to demonstrate that respondent's disallowance of the deductions for food purchases was incorrect. However, as to the delivery charges, the record describes, in some detail, C.B.C.'s procedure for documenting the payment thereof, C.B.C. operated in the same manner during all 3 years for which this adjustment was made; yet respondent's determinations, while substantially reducing the deductions allowable for fiscal 1959 and 1960, almost eliminate it for fiscal 1961. Relying upon *Cohan* v. *Commissioner*, 39 F. 2d 540 (C.A. 2, 1930), we have modified the amounts allowable as delivery charge deductions in order to correlate them with the total amounts of purchases of merchandise. Otherwise, we must sustain respondent's adjustments to this item. Similarly, since Cicio presented no evidence to show that the amounts of the disallowed deductions were not ultimately received by him as constructive dividends, we sustain respondent's determination that they were so received.

The burden rested with C.B.C. and Cicio to show that the deficiency determinations were erroneous. *Thomas B. Jones*, 29 T.C. 601, 614 (1957). We are satisfied that they have carried that burden only to the extent reflected in our Findings. We recognize that there is a substantial possibility that, if income was in fact diverted to Cicio through

C.B.C.'s claiming excessive deductions, such income may have been deposited in Cicio's bank accounts and thus included in the unexplained deposits. If so, Cicio is, in effect, being taxed twice on the same income. But a diligent search of the record has failed to show any evidence to support a finding to this effect.

The third adjustment involves a $3,000 payment by Cicio to C.B.C. in 1958; the fourth adjustment pertains to a number of checks, drawn on C.B.C.'s checking account and cashed by Cicio, which respondent claims represent unreported taxable income to Cicio of $11,870 for 1960 and to C.B.C. of $18,250 for its taxable year ending March 31, 1961. The notice of deficiency addressed to Cicio makes no reference to these transactions; it merely states that "As a result of an analysis of your personal checking account," amounts (including the adjustments under discussion here) "representing unreported income of C.B.C. Super Markets, Inc. deposited in the above account" are taxable to Cicio. The notice of deficiency to C.B.C. likewise is silent as to these adjustments, including them in the amounts determined to have been "unreported income * * * which was deposited in the personal checking account of Frank C. Cicio."

The answer in Cicio's case (docket No. 5001-67), however, excludes the amounts of these adjustments from the total unexplained bank deposits and alleges instead that "During the taxable years 1958 and 1960 petitioners received additional dividend income which they did not report on their income tax returns amounting to $3,000.00 for 1958 and $11,870.00 for 1960 from unreported income of C.B.C. Supermarkets, Inc. *which they did not deposit in their personal bank accounts.*" (Emphasis added.) The latter item is alleged as $18,250 in the answer in C.B.C.'s case (docket No. 5000-67).

Respondent implicitly admits in these allegations that his original determinations—including these amounts in the unexplained bank deposits—were erroneous, and that he is instead relying on the new grounds pleaded in the answers to support the deficiencies. In these circumstances respondent is deemed to have abandoned his original determinations, *Leon Papineau,* 28 T.C. 54, 57 (1957), and, consequently, he must assume the burden of proof on the adjustments alleged in the answers. Rule 32, Tax Court Rules of Practice; see *Sheldon Tauber,* 24 T.C. 179, 185 (1955). We do not think respondent has satisfied that burden.

As to the $3,000, respondent's theory appears to be that Cicio advanced this sum in cash to C.B.C. on either May 1 or May 31, 1958, and that, since the source of the money is unknown, the sum is taxable to both C.B.C. and Cicio. Respondent offered no evidence to support his allegation. Cicio professed ignorance of the item and showed that C.B.C.'s daily record book reflects no such transaction. We hold that

neither Cicio nor C.B.C. received taxable income from the transaction alleged by respondent.

Concerning the $11,870, Cicio was able to demonstrate that near the end of each week, beginning in September 1960, he drew checks payable to cash on C.B.C.'s account, cashed them, and returned the currency and silver to C.B.C. for its use in weekend operations when the banks were closed. We infer that the same pattern of operations continued to March 31, 1961, the end of C.B.C.'s taxable year. There is no basis in this record for taxing the amounts of these checks to both C.B.C. and Cicio, or to either of them.

## Collateral Estoppel

Turning to the additions to the tax under section 6653(b),[6] Cicio was convicted under section 7201[7] of filing false and fraudulent joint income tax returns for himself and Ann for 1958, 1959, and 1960 and filing and causing C.B.C. to file false and fraudulent corporation income tax returns for its taxable years ending March 31, 1959, 1960, and 1961. We must decide the effect of this conviction on the rights of (a) Cicio, (b) Ann, and (c) C.B.C. to litigate the additions to the tax for fraud.

As to Cicio individually, it is now well settled that the criminal judgment of conviction requires application of the doctrine of collateral estoppel and that, as to him, at least part of any underpayment for the prosecution years must be deemed already to have been judicially determined to be "due to fraud" within the meaning of section 6653(b). Since the same basic issue has already received full judicial review in a case involving the same parties, a second court may not reconsider the matter. *Moore* v. *United States*, 360 F. 2d 353, 356 (C.A. 4, 1966), certiorari denied 385 U.S. 1001 (1967); *Tomlinson* v. *Lefkowitz*, 334 F. 2d 262, 265 (C.A. 5, 1964), certiorari denied 379 U.S. 962 (1965); *John W. Amos*, 43 T.C. 50, 55 (1964), affd. 360 F. 2d 358 (C.A. 4, 1965). This rule applies here even though resolution of the fraud issue in the cases of C.B.C. and Ann requires an analysis of the evidence on which Cicio's liability would otherwise depend. See *Armstrong* v. *United States*, 173 Ct. Cl. 944, 971, 354 F. 2d 274, 291

---

[6] SEC. 6653.  FAILURE TO PAY TAX.

   (b) FRAUD.—If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a).

[7] SEC. 7201.  ATTEMPT TO EVADE OR DEFEAT TAX.

   Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 5 years, or both, together with the costs of prosecution.

(1965). Cicio's contention that he was wrongfully convicted and that, therefore, he is not collaterally estopped, is without merit.

Cicio's wife, Ann, was not a party to the criminal proceeding. And this Court has recently held that a husband's conviction for having filed false and fraudulent joint income tax returns does not collaterally estop his wife from denying that any part of the underpayments of tax was due to fraud. *Henry M. Rodney*, 53 T.C. 287 (1969); see also *Moore* v. *United States, supra.* We must follow that holding in this case. Even though Cicio, who compiled the data used in preparing the joint returns, was convicted on a finding that they were fraudulent, Ann is entitled to her day in court.

For much the same reason C.B.C. is not collaterally estopped by Cicio's conviction for filing and causing it to file false and fraudulent corporation returns. The corporation itself is entitled to be heard on the question whether any part of its underpayments was due to fraud. "A lawsuit is not a laboratory experiment for the discovery of physical laws of universal application but a means of settling a dispute between litigants"; collateral estoppel applies only to the "parties themselves and those who are in such relation to the parties as to be considered in privity with them." *Hornstein* v. *Kramer Bros. Freight Lines*, 133 F. 2d 143, 145 (C.A. 3, 1943).

Since C.B.C. was actively engaged in business activity throughout its existence, it was an entity separate and distinct from Cicio and its other stockholders; this separate existence may not be ignored. *Moline Properties* v. *Commissioner*, 319 U.S. 436, 438–439 (1943). C.B.C. was not a party to the criminal proceeding in which Cicio was convicted and did not participate in any way in his defense.[8] C.B.C. could have been indicted and tried jointly with Cicio. See, e.g., *Currier* v. *United States*, 166 F. 2d 346 (C.A. 1, 1948). It was not. Had it been, a conviction—even one based on a guilty plea—would have provided a basis for collaterally estopping it in the present proceeding. *Arctic Ice Cream Co.*, 43 T.C. 68, 75 (1964). But in such a trial C.B.C.'s status as a separate entity would have been observed; indeed, even were it acquitted therein, Cicio still might have been convicted of causing it to file false returns. See, e.g., *United States* v. *Augustine*, 188 F. 2d 359 (C.A. 3, 1951), certiorari denied 342 U.S. 815 (1951) (cases 1 and 2). Thus, in no sense can it be said that C.B.C. was a party to, or was represented in, the criminal litigation involving Cicio.

Nor can it be said that C.B.C. was in privity with Cicio. Cf. *Henry*

---

[8] While counts IV, V, and VI of the indictment alleged that Cicio was the president of C.B.C., this was not an essential element of the violation of sec. 7201 charged therein. The indictment was returned only against Cicio, and not against C.B.C. Cf. *Irving Sachs*, 32 T.C. 815, 820 (1959), affd. 277 F. 2d 879 (C.A. 8, 1960), certiorari denied 364 U.S. 833 (1960).

*M. Rodney, supra.*[9] What we said in *American Range Lines, Inc.*, 17 T.C. 764 (1951), remanded on another issue 200 F. 2d 844 (C.A. 2, 1952), is quite instructive in this regard. There, in a prior case involving a sole shareholder, it had been held that certain moneys she had received were not distributions of her corporation's earnings but were the proceeds of the sale of her individually owned asset. *Lucille H. Rogers*, 11 T.C. 435 (1948), reversed in part 180 F. 2d 720 (C.A. 3, 1950). In the second case, the corporation contended that the principle of collateral estoppel applied to protect it from a determination by the Commissioner that the same income was taxable to it. This Court rejected the contention, explaining as follows (17 T.C. at 771):

There remains only to be considered petitioner's contention that the *Rogers* proceedings are binding under the doctrine of res judicata. That principle is normally applicable where the issues and the parties are the same. See *Evergreens* v. *Nunan* (C.A. 2), 141 F. 2d 927, certiorari denied 323 U.S. 720; *Commissioner* v. *Sunnen*, 333 U.S. 591. It is pressed upon us here, however, that, even though the parties are different, Mrs. Rogers' status as petitioner's stockholder created a privity between them which renders the prior proceeding binding as to this petitioner. Cf. *D. Bruce Forrester*, 4 T.C. 907.

It is one thing, however, to bind the individual stockholders in their capacity as such by the official acts of their corporation, including any litigation in which it may engage.[2] It is quite another to force the corporation to conform to actions participated in by its stockholders in their individual capacity. Where the prior litigation is of this nature, it does not form the basis for estoppel by judgment in later litigation in which the corporation is a party. * * * [Footnote omitted.]

Our decision was affirmed by the Court of Appeals for the Second Circuit—the court which would hear an appeal of the present case. The court said:

We regard as inapposite cases holding that in some circumstances a stockholder may be bound by a prior adjudication in a suit brought by his corporation: The proposition that the corporation's acts may bind the stockholder * * * does not support the converse proposition. * * *

200 F. 2d at 845. The facts of the case at bar provide an even stronger basis for denying the application of collateral estoppel, for two reasons: (1) The party against whom the estoppel is sought to be applied here has never had an opportunity to litigate the affected issue, as did the Commissioner in *American Range Lines;* and (2) here there is no identity of the interests of the shareholder who litigated the first suit and the corporation, as in that case. C.B.C. represents the possible interests of its minority shareholders as well as the interests of Cicio. Indeed, the very income and deduction items falsified in the corpora-

---

[9] It should be noted that we do not have here the problem which caused such great concern to the dissenters in *Henry M. Rodney*, 53 T.C. 287 (1969)—the effect of joint and several liability on the question of privity between a husband and wife who file a joint return. (See the dissenting opinion of Judge Dawson, *id.* at 325: also see the concurring opinion of Judge Tannenwald, *id.* at 322–323.)

tion's returns may actually represent funds embezzled or otherwise wrongfully withdrawn from the corporation, to the detriment of other shareholders. Thus, we find no reason for denying C.B.C. the right to litigate its liability for the additions to the tax for fraud.

## Fraud

Section 7454 (a) places the burden upon respondent to show by clear and convincing evidence, *Drieborg* v. *Commissioner*, 225 F. 2d 216, 218 (C.A. 6, 1955), that at least a part of the deficiencies was due to fraud. We do not think he has made the requisite showing.

Aside from relying upon collateral estoppel, discussed above, respondent makes a two-pronged attack: First, he urges that the notices of deficiency disclosed a "wide discrepancy" between the "reported taxable income and the unreported taxable income" of each petitioner for each year. Second, he refers to two specific items of alleged fraud: (1) A transaction with Queens Dairy Farms, Inc., from which the agents determined that C.B.C. received unreported taxable income and Cicio ultimately received money which he did not report; and (2) overstatements of meat purchases by C.B.C.

The weakness of the first prong—the alleged discrepancy between reported and unreported income—is that it is based almost completely upon respondent's own determinations in the deficiency notices, not upon concrete facts from which an intent to cheat the Government may be inferred. The testimony of respondent's agents as to the reasoning and opinions they employed in computing the deficiencies is not clear and convincing evidence of fraud. Nor does the fact that respondent adopted their opinions and determined a greater liability than that reported, or even that the determination is sustained in part, show fraud. See, e.g., *Estate of Louis L. Briden*, 11 T.C. 1095, 1133 (1948), affirmed on another issue 179 F. 2d 619 (C.A. 1, 1950) ; *James Nicholson*, 32 B.T.A. 977 (1935), aff'd. 90 F. 2d 978 (C.A. 8, 1937).

Turning then to the alleged specific instances of fraud, the agents testified that they found that C.B.C. had received a $2,000 check from Queens, which they concluded was a rebate which had not been included in C.B.C.'s income, and that shortly thereafter $1,400 was deposited in Cicio's individual account. Cicio, however, asserted that the $2,000 was a loan rather than a rebate, that up to the date of the transaction C.B.C. had not even done any business with Queens, and, moreover, that Queens later sued for repayment of the loan. No one from Queens was called as a witness to explain the transaction. The agent obviously did not personally know the underlying facts.

As to the alleged overstatements of meat purchases, the agents' determinations, according to their testimony, were based primarily on a comparison of the amount of sales recorded by a supplier, Lee

Foods, Inc., in its books and the amount of purchases from Lee recorded in C.B.C.'s books. But, again, no one from Lee was called to testify. Nor were Lee's books introduced in evidence. No showing was made, for example, that Lee had not falsified its own book entries in order to serve its purposes.

It is true that the parties stipulated that Cicio each year made bank deposits in amounts which were substantially in excess of his reported income. But this does not establish that the deposits were taxable income. As discussed above, Cicio frequently used his own and borrowed funds to make loans to, and pay expenses on behalf of, C.B.C. The corporation then made repayments which he deposited in the account. He also deposited borrowed funds in this account. Cicio was able, even at the late date of the trial, to demonstrate that large amounts of the deposits were not taxable income. We do not think evidence of the remaining deposits alone is sufficient to meet the clear-and-convincing-evidence test. *Goe v. Commissioner*, 198 F. 2d 851, 852 (C.A. 3, 1952), affirming a Memorandum Opinion of this Court, certiorari denied 344 U.S. 897 (1952) ; *Thomas B. Jones, supra* at 619; *Denny York*, 24 T.C. 742, 743 (1955) ; cf. *John Marinzulich*, 31 T.C. 487, 490 (1958).

In summary, we hold on the record before us that, except for Cicio's liability for 1958, 1959, and 1960, as to which he is collaterally estopped, respondent has not shown by clear and convincing evidence that any part of the underpayments by either Cicio and Ann for 1957 through 1961, or C.B.C. for its fiscal years ending March 31, 1958 through 1961, was due to fraud.[10]

## Transferee Liability

In the deficiency notice in docket No. 4999–67 respondent determined that Cicio was liable as a transferee of property of C.B.C. to the extent of $87,899.74, the amount of the deficiencies and additions to the tax determined in the case of C.B.C., plus interest as provided by law. Respondent argues on brief that the transfers consisted of the unexplained deposits in Cicio's bank accounts, totaling $110,627.76, plus the amounts of the unsubstantiated deductions for purchase of merchandise and delivery charges. Respondent contends that Cicio diverted to his own use amounts equal to the disallowed deductions by "causing or having certain personal expenses to be reflected in the corporate records of said corporation for purchases of supplies."

Section 6901(a)(1)(A)(i) authorizes the assessment of transferee liability, at law or in equity, in the same manner as the liability for

---

[10] This holding that respondent has not shown fraud for the prosecution years in no way impugns the criminal conviction, for there is no showing that the record before the District Court was limited to the meager record of the present proceeding.

income taxes. This provision, however, does not create any separate liability; it merely provides a secondary method for enforcing the existing liability of the transferor. See *Robbins Tire & Rubber Co.*, 53 T.C. 275, 278 (1969). The substantive question of whether a transferee is liable for the transferor's obligation depends upon State law. See, e.g., *Commissioner v. Stern*, 357 U.S. 39, 45 (1958).

In neither the deficiency notice nor the pleadings has respondent informed us of the provision of State law on which he relied in determining Cicio's liability as a transferee. On brief he merely takes the broad position that "the transferor C.B.C. was rendered, and is, insolvent and without assets with which to pay the said deficiencies and additions to the taxes due from it for the involved years." The essence of this argument is embodied in N.Y. Debt. & Cred. Law sec. 273 (McKinney 1945) (hereinafter N.Y. Debt. & Cred. Law), as follows:

Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

Accordingly, the evidence presented will be measured against this standard. In so doing, we are mindful that section 6902(a) casts the burden of proof on respondent "to show that a petitioner is liable as a transferee of property of a taxpayer." We do not think respondent has carried his burden in at least two respects.

First, respondent has not shown that C.B.C. transferred property to Cicio; by the very terms of section 6901(a)(1)(A), this was an essential element of his case. We have already discussed the evidence on this subject in connection with the issues relating to the correct amount of the deficiencies and to fraud, concluding that neither party has fully carried his burden thereon. While the clear-and-convincing-evidence rule applies in resolving the fraud issue, only a preponderance of the evidence is required to show transferee liability. Nevertheless, we do not think respondent has made the requisite showing.

The determinations in the deficiency notices do not, by themselves, constitute evidence of transfers of property; otherwise, section 6902(a) would be meaningless. Looking at the trial record, there is no substantial evidence whatever to show that C.B.C. made transfers to Cicio in the amounts of the disallowed deductions for purchases of merchandise and delivery charges; nor is there any direct evidence that any funds were taken from C.B.C. and deposited in Cicio's bank account. In some circumstances deposits made to a controlling stockholder's credit might support an inference that the corporation had

made transfers to him. But here Cicio has shown that substantial amounts of loan proceeds were deposited in his bank account and urgently insists that none of the other deposits represent withdrawals from C.B.C.

In light of the evidence introduced by Cicio, we do not think it is unreasonable to require that respondent demonstrate how these sums were withdrawn from C.B.C., trace typical transactions, or otherwise refute Cicio's testimony. Except for the contentions rejected above regarding the transactions with Queens Dairy Farms, Inc., and Lee Foods, Inc., he did not do so. We hold that he has failed to carry his burden of showing that C.B.C. made transfers of property to Cicio.

But even if we could reasonably infer that Cicio's unexplained bank deposits were transfers from C.B.C., respondent's case must fail, we believe, for lack of proof that C.B.C. was insolvent when they were made or was rendered insolvent thereby. That C.B.C. ultimately failed in late 1965, more than 3 years after the period here involved, is obviously insufficient proof of its financial condition when the transfers were allegedly made. See *Scott* v. *Commissioner*, 117 F. 2d 36 (C.A. 8, 1941) ; *Terrace Corporation*, 37 B.T.A. 263,268 (1938).

Under the New York law a person is insolvent when the "present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured." N.Y. Debt. & Cred. Law sec. 271. This statutory test is essentially the same as the so-called "bankruptcy" test of insolvency approved in *Kreps* v. *Commissioner*, 351 F. 2d 1, 9 (C.A. 2, 1965), affirming 42 T.C. 660 (1964).

Respondent offered no evidence as to the "fair salable value" of C.B.C.'s assets during the pertinent period. Indeed, the only evidence of C.B.C.'s financial situation during this time is the abbreviated balance sheets attached to its income tax returns. Even if the balance sheets may be used to shift the burden to Cicio to establish that C.B.C. had other assets or that the "fair salable value" of the listed assets exceeded the amounts shown, cf. *Kreps* v. *Commissioner*, *supra* at 10, they do not show that C.B.C. was insolvent.

The additional taxes due from C.B.C. for each of the years in issue, computed in accordance with our findings, should be treated as liabilities for those years. *Scott* v. *Commissioner*, *supra; Kreps* v. *Commissioner*, *supra* at 10. Nevertheless, the balance sheets show a surplus each year of a sum in excess of $2,000, plus a capital stock account of $27,000. Therefore, accepting all items at book value, at least $29,000 would have been available on liquidation of C.B.C. to pay its tax. Applying the above conclusions as to the additions to the tax and our findings as to unreported income, it appears that

C.B.C. was solvent at all times during its fiscal years ending March 31, 1958, through March 31, 1961.

Reviewed by the Court.

> *Decision will be entered for petitioner in docket No. 4999–67.*
>
> *Decisions will be entered under Rule 50 in docket Nos. 5000–67 and 5001–67.*

---

DAWSON, J., dissenting in part: I respectfully disagree with the majority opinion on the issues relating to the application of collateral estoppel to Cicio's wife, Ann, and to his controlled corporation, C.B.C. As in *Henry M. Rodney*, 53 T.C. 287 (1969), the majority of this Court has once again eroded the very useful doctrine of collateral estoppel in Federal tax cases. And in my view its restrictive attitude toward collateral estoppel in these particular circumstances is legally unsound.

For the reasons fully set out in my dissenting opinion in *Henry M. Rodney, supra* at 325–329, I would find Ann Cicio, who filed joint income tax returns with her husband, collaterally estopped on the fraud issue. I will not repeat those reasons in this dissent, but merely incorporate them by this reference.

I must also dissent from what appears to be another application of the "day in court" syndrome which seems to be bothering the majority. It states that "The corporation itself is entitled to be heard on the question" of fraud because it is "an entity separate and distinct from Cicio and its other stockholders," and because it "was not a party to the criminal proceeding in which Cicio was convicted and did not participate in any way in his defense." None of these assertions can withstand analysis in the factual setting of this case.

The doctrine of collateral estoppel forecloses relitigation of an *issue* that has been determined in an earlier case on a different cause of action. *Commissioner* v. *Sunnen*, 333 U.S. 591 (1948). For applicability of collateral estoppel, the earlier case must have resulted in a final judgment of a competent tribunal, and the parties in the earlier and later case must be identical *or in privity* with each other. *Commissioner* v. *Sunnen, supra* at 597. The doctrine of collateral estoppel is designed to prevent repetitious litigation of the *same issue* by the same parties *or their privies*. *Laughlin* v. *United States*, 344 F. 2d 187 (C.A.D.C. 1965). It is predicated on the idea that once a party or his privy has fought out a matter in litigation with the opposing party, the duel cannot be later renewed. *E. V. Prentice Machinery Co.* v. *Associated Plywood Mills*, 252 F. 2d 473, 476 (C.A. 9, 1958).

The pivotal question here is whether Frank Cicio and C.B.C. were in "privity," so that the judgment of conviction against Cicio in the U.S. District Court for the Eastern District of New York for filing,

or causing to be filed, false and fraudulent corporation income tax returns collaterally estops C.B.C. from relitigating the fraud issue in this proceeding. As I pointed out in *Rodney*, "privity" is a shorthand way of establishing that an individual or corporate entity is not a "stranger" to an action and is affected by a decision in such action. In *United States* v. *California Bridge Co.*, 245 U.S. 337, 341 (1917), the Supreme Court said:

> The doctrine of estoppel by judgment, or res judicata, as a practical matter, proceeds upon the principal that one person shall not a second time litigate, *with the same person or with another so identified in interest with such person that he represents the same legal right*, * * * [Emphasis supplied.]

"Privity" in the sense of "identity of interests" has been broadly applied. *Tait* v. *Western Md. Ry. Co.*, 289 U.S. 620 (1933). Recently, "privity" has been extended to include various categories beyond the classical definition. For example, the Restatement of Judgments, sec. 83, defines "privy" as including "those who control an action although not parties to it [nonparticipating parties]," and "those whose interests are represented by a party to an action." Thus, the term "privity" in itself does not state a reason for either including or excluding a person from the binding effect of a prior judgment, but rather it represents a legal conclusion that the relationship between the one who is a party on the record and the nonparty is sufficiently close to afford application of the principle of preclusion. Cf. *Woodley Petroleum Co., et al.*, 16 B.T.A. 253 (1929); *Monolith Portland Midwest Co.* v. *Riddell*, (S.D. Cal. 1962, 21 A.F.T.R. 2d 1525, 62–2 U.S.T.C. par. 9750). The emphasis should be upon the policy of ending litigation where there has been a fair trial of one's interests because the doctrine of collateral estoppel is primarily one of public policy and only secondarily of private benefit to the litigants.[1]

---

[1] An interesting case showing the current attitude of the courts toward "privity" and identity of parties is *United States* v. *United Air Lines, Inc.*, 216 F. Supp. 709 (E.D. Wash., D. Nev. 1962), which involved litigation arising out of a crash of a passenger plane and a military aircraft. The matter of liability on the part of the defendant company was the subject of litigation in California courts in actions brought by heirs of some passengers. Still pending were cases in the Eastern District of Washington and in the District of Nevada. These cases were heard by a District judge sitting in the two districts by special assignment. In holding the doctrine of preclusion applied and that the matter of liability would not be relitigated, the court stated at pp. 725–726 :

"the Courts, increasingly so in the last 20 years, have not adhered to that doctrine [requiring identity of parties], and have held that no constitutional right is violated where *the thing to be litigated was actually litigated in a previous suit, final judgment entered, and the party against whom the doctrine is to be invoked had full opportunity to litigate the matter and did actually litigate it.*

\* \* \* \* \* \* \*

"It would be a travesty upon that concept ['in the interest of justice'] to now require these plaintiffs who are the survivors of passengers for hire on the United Air Lines plane to again relitigate the issue of liability after it has been so thoroughly and consummately litigated in the trial court in the 24 consolidated cases tried in Los Angeles. *There is every reason 'in the interest of justice' for not invoking the rule requiring identity of parties, and no reason in justice or law for invoking it in these cases.* Nor is there any constitutional bar to the conclusions herein reached. The defendant has had its day in court on the issue of liability before a jury. *And due process is not a one way street.*" (Emphasis added.)

I acknowledge that, as a general proposition, a judgment rendered against a stockholder or corporate officer of a widely held corporation in an action brought against him by an outsider is not binding upon the corporation and does not operate to collaterally estop the corporation. But the authorities are not in agreement as to whether a judgment for or against a stockholder or corporate officer collaterally estops the corporation by virtue of the fact that he has a controlling interest in the corporation and is in complete charge of its financial and business operations. See Annotation, 81 A.L.R. 2d 1323 (1962). Some authorities, including the Court of Appeals for the Second Circuit in *American Range Lines* v. *Commissioner*, 200 F. 2d 844, have held that the judgment against the controlling stockholder or officer does not operate as an estoppel against the corporation. But there is support for the view that a judgment on the merits in favor of the directors of a corporation owning a majority of its shares of stock, and having complete control and actual personal supervision of its affairs and assets, bars an action against the corporation predicated upon the same facts and issue in the earlier suit against the directors. See Annotation, 81 A.L.R. 2d 1326 (1962) ; *Young* v. *Rohrbough*, 129 N.W. 167 (Neb. 1910). In New York, where C.B.C. did business, a sole owner of a corporation has been held to be in "privity" with the corporation so that a judgment against him is conclusive upon the corporation. See *In Re Shea's Will*, 309 N.Y. 605, 132 N.E. 2d 864 (1956).

It is true that C.B.C. was not formally a party to Cicio's criminal tax case. But for the doctrine of collateral estoppel to apply, it is enough that Cicio and C.B.C. are in privity. *Commissioner* v. *Sunnen*, *supra* at 597; Restatement Judgments, sec. 83 (1942). As examples of privies, the Restatement of Judgments lists the following: Persons who participate but are not parties (sec. 84) ; persons on whose account an action is brought or defended (sec. 85) ; class actions (sec. 86) ; persons having future interests (sec. 87) ; bailors and bailees (sec. 88) ; successors in interest (secs. 89, 90) ; persons claiming under survival, revival or death statutes (sec. 92). The characteristics common to all of these privies, and the reasons for collaterally estopping them, are (1) an identity of interest, and (2) the ability of one to adequately represent the other. See Vestal, "Preclusion/Res Judicata Variables: Parties," 50 Iowa L. Rev. 27 (1964), where it is pointed out that—

The first lesson learned in an examination of the matter of preclusion is the great vitality and growth of this concept. Principles which perhaps stated the law correctly two decades ago no longer can be said to be valid. *The key to preclusion now is not that certain parties have litigated, but rather that an issue has been adjudicated.* The emphasis is not on a concept of identity of parties in the first and second suits. Rather. *the shift has been to the practical situation*

*involved.* Has the litigant in suit II been represented in the first suit so that it is reasonable and constitutionally permissible to hold him precluded? * * * [Emphasis added.]

The principle of preclusion, or collateral estoppel, has been expanded by "broadening the definition of 'privity' " and "restricting the requirement of 'mutuality.' " *Id.* at 44; Semmel, "Collateral Estoppel, Mutuality and Joinder of Parties," 68 Col. L. Rev. 1457, 1458 (1968).

In this case one must look at the practicalities of the situation and the close relationship between Cicio and C.B.C. in determining whether "privity" existed. In my judgment the facts lead inexorably to the conclusion that there was "privity" in these particular circumstances. Although C.B.C. may be "an entity separate and distinct from Cicio" for most taxpaying purposes, it certainly was not separate from him in the filing of false and fraudulent corporation income tax returns. According to the criminal indictment filed on January 28, 1965, Cicio in his capacity as "the controlling stockholder, president, manager and responsible officer of C.B.C. Super Markets, Inc." willfully and knowingly evaded the taxes of C.B.C. by filing or causing to be filed on behalf of the corporation false and fraudulent income tax returns for the fiscal years ended March 31, 1959, 1960, and 1961. C.B.C. had no mind of its own; it was controlled and operated by Cicio, who owned 69.5 percent of its shares of stock. It is elementary that a corporation can act only through its officers and agents, and Cicio as such was acting on the corporation's behalf when he knowingly signed and filed returns for it which he knew were false and fraudulent. Cicio was convicted in the District Court of causing C.B.C. to file fraudulent income tax returns. In committing such "fraud" the motives and actions of Cicio and C.B.C. were identical.[2] C.B.C. was certainly no "stranger" to the criminal tax case against Cicio. To conclude as the majority does, that there was no "fraud" most assuredly undermines the correctness of the prior decision of the District Court on that issue.

Since both Cicio and C.B.C. may be penalized for filing fraudulent returns, it was in the interests of both to assert that the returns were not fraudulent. Thus, in the ordinary case, it is natural for the responsible officer and the corporation to defend the other. Since Cicio is the majority shareholder, who dominated the financial and business operations of C.B.C., we may presume that his corporation cooperated fully in building his defense in the criminal tax case. This being so, then C.B.C. has been adequately represented. Cicio was the person who was acting for the corporation in both proceedings, criminal and civil,

[2] By analogy, see and compare secs. 6671 and 6672, I.R.C. 1954, which by statute create "privity" between a corporation and its responsible officer, making the officer personally liable for a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over. *Hewitt* v. *United States,* 377 F. 2d 921 (C.A. 5, 1967).

and because of this the corporation has clearly had its "day in court" on the fraud issue.

It may sometimes happen that a corporation will not assist the majority shareholder in his criminal tax trial. His board of directors may desert him, or he may have sold his shares. In such cases the corporation should have the opportunity to show that it was not adequately represented at the prior trial.

Our opinion in *American Range Lines, Inc.*, 17 T.C. 764 (1951), appears to rest upon a collection of outmoded cases. In *Cleveland-McLeod Lumber Co.* v. *McLeod*, 96 Ark. 405, 131 S.W. 878 (1910), and *Philadelphia Auburn-Cord Co.* v. *Shockcor*, 133 Pa. Super. 138, 2 A. 2d 501 (1938), the courts apparently required complete identity of parties for estoppel. In *Spitz* v. *M. Brooks & Son, Inc.*, 210 App. Div. 438, 206 N.Y.S. 313 (1924), estoppel was denied for lack of mutuality. But now in New York "the doctrine of mutuality is a dead letter." *B. R. DeWitt, Inc.* v. *Hall*, 19 N.Y. 2d 141, 278 N.Y.S. 2d 596 (1967). In *Societe Vinicole de Champagne* v. *Mumm Champagne & I. Co.*, 10 F. Supp. 289 (S.D.N.Y. 1935), affd. 143 F. 2d 240 (C.A. 2, 1944), the basis of the decision is not explained. I think we should feel free to reexamine the rationale of *American Range Lines, Inc.*, in the light of the facts present in the instant case.

I do not suggest that a corporation and its majority shareholder inevitably share the same interests in the same degree, or that a corporation should always be collaterally estopped by a judgment against its majority shareholder. But in some areas one is merely the "alter ego" of the other where the Federal tax law is concerned. Cf. *Barzilay* v. *United States*, 256 F. Supp. 1010 (S.D. Fla. 1966). I regard "fraud" as such an area.

The majority expresses concern that the "income and deduction items falsified in the corporation's returns may actually represent funds embezzled or otherwise wrongfully withdrawn from the corporation, to the detriment of other shareholders." Such acts may be illegal, and they may be unknown to and unauthorized *by minority shareholders.* But if respondent had proved fraud by offering the same evidence which was used at the criminal trial, the corporation could not expect immunity because of the innocence of its minority shareholders. *Bender* v. *Commissioner*, 256 F. 2d 771 (C.A. 7, 1958); *Irving S. Federbush*, 34 T.C. 740 (1960), affirmed per curiam 325 F. 2d 1 (C.A. 2, 1960). It seems to me that the remedy of the minority shareholders is an action against Cicio.

Accordingly, I would find on this record the "privity" necessary for invoking collateral estoppel against the corporation whose majority stockholder and president completely dominated and controlled its financial and business affairs and, in such capacity, caused false and

fraudulent income tax returns to be filed on behalf of the corporation. The *ultimate fact* contained in the judgment of conviction in the criminal tax case by the U.S. District Court establishing that the corporation returns were false and fraudulent should, in my opinion, preclude the relitigation of the fraud issue in this proceeding. *The Evergreens* v. *Nunan*, 141 F. 2d 927, 928 (C.A. 2, 1944), certiorari denied 323 U.S. 720.

TIETJENS, RAUM, HOYT, SIMPSON, and QUEALY, *JJ.*, agree with this dissent.