NICK ZADORKIN AND ALICE ZADORKIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Zadorkin v. Commissioner
Docket No. 3115-83.
United States Tax Court
T.C. Memo 1985-137; 1985 Tax Ct. Memo LEXIS 504; 49 T.C.M. (CCH) 1022; T.C.M. (RIA) 85137; March 25, 1985. Mark S. Drobny, for the petitioners. Robert J. Foley, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined that petitioners are liable under section 6901[1] as transferees for unpaid Federal income taxes and additions to tax owed by Mike S. Zadorkin for 1973 through 1978 in the total amounts of $4,950.72 plus interest as provided by law. Petitioners do not challenge the correctness of the amounts of the determined income tax deficiencies and additions to tax due from Mike S. Zadorkin, who is now deceased, but petitioners contend that they are not liable for those amounts as transferees, raising the following specific issues: 1. Whether Mike S. Zadorkin transferred a residence located in Pacifica, California, to petitioner Nick Zadorkin on July 24, 1978, for less than *506 full and adequate consideration. 2. Whether Mike S. Zadorkin was insolvent at the time of, or was rendered insolvent by, the transfer. 3. Whether the Internal Revenue Service made a reasonable effort to collect the unpaid tax liabilities from Mike S. Zadorkin. FINDINGS OF FACT At the time they filed their petition, petitioners Nick and Alice Zadorkin were legal residents of Sacramento, California. They are the brother and sister-in-law of Mike S. Zadorkin (Mike), now deceased. Mike was born on June 4, 1921.During the 1970's, he was a self-employed jewelry salesman. From the mid-1970's until his death on April 3, 1982, he suffered from alcoholis which adversely affected his health had his ability to manage his business and personal affairs. Mike did not file timely Federal income tax returns for 1973 through 1977. In June 1977, an officer of the Collection Division of the Internal Revenue Service (IRS) contacted Mike concerning his delinquent returns. After a period *507 of investigation, Mike filed Federal income tax returns for 1973 through 1978 on March 30, 1979. He subsequently paid some of the liabilities shown on the delinquent returns; however, he did not pay the following income taxes and additions to tax: Addition to Tax
Sec. 6651(a)(1),
Sec. 6651(a)(2),
Sec. 6654,
Year
Deficiency
I.R.C. 1954
I.R.C. 1954
I.R.C. 1954
1973
$ 938.21
$125.29
$139.21
$ 5.61
1974
$ 615.04
$138.38
$147.61
$ 19.68
1975
$1,0456.00
$235.35
$188.28
$ 45.35
1976
$ 779.00
$175.28
$ 93.48
$ 29.01
1977
$ 63.00
$ 14.18
$ 3.78
$ 2.25
1978
$ 146.00
$ .73
$3,587.25
$688.48
$537.09
$101.90
Petitioners do not contest that Mike was liable for the foregoing unpaid income taxes and additions to tax plus interest as provided by law. On July 16, 1966, Mike's sister, Vera Z. Ballestrassee, died leaving Mike an interest in property located at 367 Seaside Drive, Pacifica, California (Seaside Drive property). The Seaside Drive property was distributed to Mike by a decree of final distribution entered by the Superior Court of the State of California in and for San Mateo County on September 7, 1967. *508 On July 24, 1978, Mike executed a quitclaim deed transferring the Seaside Drive property to petitioner Nick Zadorkin (Nick). On the same day, Nick transferred the property to himself and his wife, Alice Zadorkin. The consideration for Mike's transfer of the Seaside Drive property to Nick, it is stipulated, included: 1. Payment of a mortgage note and other debts to the Bank of America in the amount of $2,496.31; 2. Satisfaction of a judgment of I.N.G. Gems, Inc., in the amount of $1,323.10; and 3. Payment of an overdue semi-annual property tax bill in the amount of $211. The Seaside Drive property is a residence located in the Fairway Park neighborhood in Pacifica, California, about 15 miles south of San Francisco. The residence was built in 1955 and has three bedrooms, two bathrooms, living room, dining room, and kitchen and is located on a lot with 5,000 square feet. Most of the houses in the community were built at or about the same time and are owner-occupied. The property had a value of $60,000 at the time of the transfer. The Collection Division of the IRS secured an information statement (Form 433-AB) from Mike on March 30, 1979, when the delinquent returns *509 were filed. Under penalties of perjury, Mike listed assets of $1,500, including a lot in San Luis Obispo shown to have a value of $1,200, and liabilities of $9,777. On January 25, 1980, Mike updated the information on his financial condition by assenting to corrections written by an IRS collection officer on the face of the statement. Although the corrections adjusted his estimated income and expenses, he did not amend the statement of his assets and liabilities. With respect to the Seaside Drive property, the IRS Form 433-AB signed by Mike contains an asset entry of $60,000. A line is drawn through this figure and the form states: "Value at time of trf. to Brother Nick 7-78. Copy of trf. document attach'd." The form also states: Transferred home to my brother Nick Zadorkin * * * was going to be foreclosed on - no monies involved - am living there at no rent at present. Among the liabilities listed on the statement is an item of $3,500 payable to "Brother Nick" with the explanation "to save the residence from foreclosure." Mike's income tax returns show that he had the following amounts of gross income in the years 1973 through 1978: Year
Gross Income
1973
$7,338
1974
$4,138
1975
$5,916
1976
$5,080
1977
$2,528
1978
$1,798
*510 Mike had an inactive savings account with a balance of $1.03 on July 24, 1978, and March 30, 1979. The account was closed on September 30, 1981, when the bank charges equaled the account's $1.13 balance. Mike had one active bank account which had the following balances on the dates indicated: Date
Balance
August 16, 1978
$ 300.00
April 13, 1979
$ 40.28
February 13, 1980
$ 224.22
April 29, 1982
$2,335.33
Respondent issued separate notice of liability to Nick and Alice Zadorkin determining that they are liable for Mike's unpaid income tax and additions to tax plus interest according to law. OPINION Section 6901(a)(1)(A) authorizes the assessment of transferee liability, at law or in equity, in the same manner as the liability for income taxes. This provision, however, does not create any separate liability; it merely provides a secondary method for enforcing the existing liability of the transferor. Mysse v. Commissioner,57 T.C. 680, 700-701 (1972); C.B.C. Super Markets, Inc. v. Commissioner,54 T.C. 882, 897-898 (1970). *511 The substantive question of whether a transferee is liable for the transferor's obligation and the extent of his liability depends upon State law. See, e.g., Commissioner v. Stern,357 U.S. 39, 45 (1958). Because section 6901 is purely procedural, the steps taken to enfore the determined liability in this case may be viewed as a substitute for the pursuit by the Government of the remedies available to it under California law. To support his claim, respondent relies upon Cal. Civ. Code sec. 3439.04 (West 1970) which is as follows: Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the coveyance is made or the obligation is incurred without a fair consideration. The parties are in dispute as to whether, under this State statute, the evidence shows (1) that Mike transferred the Seaside Drive property to Nick "without a fair consideration"; (2) that Mike, the transferor, was insolvent when the transfer was made or was rendered insolvent by the transfer; *512 and, as implicitly required by the section, (3) that the IRS made a reasonable effort to collect the unpaid taxes from Mike. [2]The burden of proving these facts rests with respondent. Sec. 6902(a); Rule 142(d). *513 1. Adequacy of the Consideration for the Transfer
Respondent contends that the Seaside Drive property had a value of $68,500 when Mike transferred it to his brother, Nick, and that the consideration approximated only about $4,000 (the mortgage note, the I.N.G. Gems, Inc., judgment, and the unpaid taxes referred to in our findings). Because the conveyance was made for a small fraction of the value of the property, respondent maintains that he has established this element of transferee liability. Petitioners, on the other hand, assert that the value of the property, as such, did not exceed $35,000, its value for real estate tax assessment purposes; that Mike retained a life estate in the property which reduces the value of the transfer to the amount of $10,986; and that Nick gave consideration in excess of that amount for the transfer. Based on these assertions, petitioners contend that respondent has failed to show that they are liable as transferees. A. Value of the Seaside Drive Property
To support his contention that the Seaside Drive property had a value of $68,500 at the time of the transfer, respondent introduced the testimony of a real estate valuation *514 expert. His testimony and valuation report show that the Seaside Drive property, located on a lot with 5,000 square feet, is a one-story wood frame single-family detached dwelling constructed in 1955 in a subdivision of basically similar residences. The expert's report contains a detailed description of the neighborhood in which the property is located, the available transportation, community facilities, and other relevant information. The expert's opinion is based primarily on 11 sales in 1978 of comparable houses in the same subdivision at prices ranging from $62,000 to $70,000. Four of the sales (at prices ranging from $67,500 to $69,500) were of houses located on the same street as the Seaside Drive property, were built at approximately the same time, and contained the same number of rooms and total square footage. Contending that the house had a value of only $35,000 at the time of the transfer, petitioners did not offer any expert testimony, but attacked the valuation report of respondent's expert on two grounds. First, they contend that Mike had not taken care of the Seaside Drive property prior to the transfer and that the house needed painting and a variety of repairs, *515 particularly with respect to dry rot of the eaves. Petitioner argue that because the valuation expert did not see the property in 1978 and did not take into account its "dilapidated condition" at that time, the report is not a reliable guide to the property's value. We note, however, that it is stipulated that petitioners paid only approximately $450 in 1980 for materials related to the repair of the property.The house was sold in 1983 for $95,000 subject to additional repairs which, according to Nick's testimony, cost about $5,000. All of this evidence suggests that a valuation based on comparable sales should be adjusted for needed repairs, but that the adjustment is far less than the amount advocated by petitioners. Second, petitioners point out that the valuation report shows that the property was assessed for local real estate taxes at $35,000. Under Article XIIIA of the California Constitution, [3] petitioners argue, the property could have been assessed at its full value following a change in ownership, and the then recently adopted "Proposition 13" provided a strong incentive for the county assessor to do so. Because the transfer of property by quitclaim deed was a reassessment *516 event, their argument goes, "there would be no reason for the county assessor to appraise the transferred property in question at anything less than its full fair market value." From the assessor's failure to change the $35,000 assessment figure, petitioners ask us to infer that the assessor, because of the dilapidated condition of the property, appraised it at $35,000 notwithstanding the much higher sales prices in 1978 of otherwise similar houses in the same neighborhood. We do not think the facts support the inference petitioners ask us to draw. We have no *517 testimony from the County assessor's office. Consequently, we do not know whether the assessor made any new appraisal of the property after it was transferred to Nick. Nor do we have any evidence of the procedure in the County assessor's office for alerting it to changes in ownership. An inference that the County assessor appraised the property after the July 1978 transfer at $35,000 would be pure conjecture. In this regard, the California statutes (Cal. Rev. & Tax. Code secs. 11901-11934 (West 1970)) authorize the imposition of a documentary transfer tax "when the consideration or value of the interest or property conveyed * * * exceeds one hundred dollars ($100) * * *." The quitclaim deed from Mike to Nick has a notation on its face that the documentary transfer tax is "none." The quitclaim deed thus indicates that there was no consideration for the transfer. We have no evidence indicating that a transfer without consideration would be called to the attention of the County assessor as a reassessment event. We are not persuaded, without any evidence on the subject, that the County assessor's *518 office followed a practice of making an independent appraisal of each property each time the ownership changed. The administrative cost of such a procedure would be enormous. We think it more likely that, when a property was transferred, the County assessor merely adjusted the appraised values for assessment purposes to accord with the consideration or the stated value for documentary transfer tax purposes on the theory that such consideration in the usual case reflects the fair market value of the property. If that is true, the deed from Mike to Nick would not have triggered a new appraisal of the Seaside Drive property. Without some explanatory evidence as to when the County assessor's $35,000 appraisal was made and the circumstances in which it would have been revised, we do not think it can be given much weight in resolving the issue in favor of petitioners. Taking into account the average 1978 sales price ($68,125) of houses located on the same street as the Seaside Drive property, other information in the valuation report, and the condition of the house when it was transferred on July 24, 1978, we find that, as of that date, its value was $60,000. We note that this finding *519 accords with Mike's representation as to the property's value in the Form 433-AB of March 30, 1979, given to the IRS Collection Division. B. Alleged Retained Life Estate
Petitioners couple their contention that the Seaside Drive property had a value of only $35,000 at the time of the transfer with an assertion that Mike retained a life estate in the property. The quitclaim deed given by Mike contains no reference to a retained life estate but petitioners contend that Nick and Mike orally agreed that Mike would have the right to occupy the property rent-free as long as he lived. To substantiate the oral agreement, petitioners point out that Mike in fact lived in the house without paying rent until he died. [4]
Citing the IRS regulations on the valuation of life estates and remainder interests, petitioners point out that Mike was 56 years of age at the date of the transfer. Under the regulations, petitioners argue, a life estate of one at that *520 age has a value of 0.68612 of the value of the transferred property and a remainder interest of only 0.31388 of such value. Applying these decimal fractions to the asserted value of $35,000, petitioners arrive at a value of $10,986 for the transfer and contend that the consideration given for the transfer was thus equal to, or exceeded, the value of the transferred remainder interest.[5]
Respondent contends that, because the deed given by Mike makes no reference to a retained life estate, we must look to California's parol evidence rule in deciding the effect of the alleged orally retained life estate, citing Estate of Craft v. Commissioner,68 T.C. 249, 263 (1977), affd. per curiam 608 F.2d 240 (5th Cir. 1979). *521 Respondent argues that, under California law, it is settled that property rights created by a deed or other written instrument cannot be limited by a prior or contemporaneous oral agreement, citing Wing v. Forest Lawn Cemetery Ass'n,15 Cal.2d 472, 101 P.2d 1099, 1103 (1940); Lewis v. Brown,22 Cal. App. 38, 133 P. 331, 333 (1913); Cal. Civ. Proc. Code sec. 1971 (West 1970). Petitioners argue that because the Government was not a party to the transaction between Mike and Nick, the parol evidence rule does not apply, citing Pierce v. Nash,126 Cal. App.2d 606, 272 P.2d 923 (1954) and Gammon v. Ealey & Thompson,97 Cal. App. 452, 275 P. 1005 (1929). We need not resolve this issue because, as more fully discussed below, the value of even a remainder interest in the Seaside Drive property exceeds the consideration given for the transfer by a sum in excess of respondent's transferee claim. C. Consideration for the Transfer
In addition to the stipulated amount of consideration of approximately $4,000 (payment of mortgage note, I.N.G. Gems, Inc., judgment, delinquent taxes), petitioners contend that they *522 gave additional amounts of consideration. First, they contend that Nick forgave Mike's indebtedness to him for moneys he had advanced to carry the mortgage on the house. The financial statement, dated March 30, 1979, several months after the transfer, however, shows a liability to "Brother Nick" in the amount of $3,500 with a notation "To save the Residence from foreclosure." We are not persuaded, in view of Mike's sworn statement to the IRS, that Nick forgave any indebtedness as consideration for the transfer. Petitioners also argue on brief that Nick obligated himself to support Mike for the rest of Mike's life as further consideration for the transfer. We do not find this argument supported by any credible evidence. In passing, we note that petitioners' present position regarding the consideration they gave for the conveyance of the Seaside Drive property is hardly consistent with their representation that no documentary transfer tax was payable on the recordation of Mike's quitclaim deed to Nick. We recognize that Nick was not asked on cross-examination to explain this inconsistency, but his representation in this respect to the local taxing authorities provides a basis *523 for some skepticism as to the reliability of some of petitioners' arguments with respect to the consideration given for the transfer. In summary, we find that the Seaside Drive property had a value of $60,000 at the time it was transferred to Nick. Even assuming that he received only a remainder interest from Mike and using the decimal fraction cited by petitioners, that interest had a value in the amount of $18,832.80 ($60,000 X .31388); using the decimal fraction .39534, which an indicated in footnote 5, supra, appears to be the correct one, the transfer would have had a value of $23,720.40. Either of these amounts, less the stipulated consideration of approximately $4,000, [6] exceeds the amount of the asserted transferee liability of $4,950.72 plus interest according to law. 2. Insolvency of Mike Zadorkin at the Time of the Transfer
*524 Respondent has the burden of proving that, at the time of the transfer, Mike was insolvent or was rendered insolvent by the transfer. Under California law, "[A] person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured." Cal. Civ. Code sec. 3439.02 (West. 1970); see C.B.C. Super Markets, Inc. v. Commissioner,54 T.C. 882, 899 (1970); Stoumen v. Commissioner,27 T.C. 1014, 1019 (1957); Kieferdorf v. Commissioner,1 T.C. 772, 777 (1943), affd. 142 F.2d 723 (9th Cir. 1944). The March 30, 1979, Form 433-AB, executed by Mike shows assets of $1,500 and liabilities of $9,777. In addition to the liabilities listed on that form, Mike owed Federal income taxes and additions to tax for 1973 through 1977 amounting to at least $4,803.99 [7] which must be taken into account, thus bringing his liabilities *525 to approximately $14,500. Scott v. Commissioner,117 F.2d 36 (8th Cir. 1941); Kreps v. Commissioner,351 F.2d 1, 10 (2d Cir. 1965), affg. 42 T.C. 660 (1964); see also Freeman v. La Morte,148 Cal.App.2d 670, 307 P.2d 734, 738 (1957). Although the Form 433-AB was executed on March 30, 1979, some 8 months after the transfer, there is no suggestion that any of his liabilities were accumulated in that period. It is clear, therefore, that Mike was rendered insolvent by the transfer of the Seaside Drive property. Petitioners contend that the foregoing figure with respect to Mike's assets does not take into account the value of two pieces of real estate that Mike owned: (1) property in San Luis Obispo and (2) property in Sacramento County, California. Petitioners contend that the value of these properties exceeded his liabilities. The Form 433-AB of March 30, 1979, makes reference to real property described as "San Luis Obispo - California Valley - Unit 4, Lot 100" and states that it had a value of $1,200. *526 A subsequent report, dated May 2, 1980, entitled "Report of Investigation of Transferee Liability" prepared in the IRS Collection Division by a collection officer who testified as a witness, contains the following entry: Taxpayer is ill and unemployed. No distranable [sic] assets. Updated 433AB secured from taxpayer (transferor) indicates he has no income. A friend lives with him and pays for food. Transferor lives in transferred property rent free. Tp sold property in San Luis Obispo reported on original 433AB and received only $738.94. Petitioners offered no satisfactory evidence showing that the value of Mike's equity interest in the San Luis Obispo property exceeded the $1,200 estimated in the Form 433-AB or the $738.94 received on its sale as reported by the collection officer in her report of May 2, 1980. Adding either amount to Mike's assets of $300 other than the San Luis Obispo property shown on the Form 433-AB, however, does not alter our conclusion that Mike was rendered insolvent by the transfer of the Seaside Drive property. His liabilities far exceeded his assets regardless of which amount is used. As to the Sacramento property, petitioner introduced in *527 evidence a copy of a deed, dated June 16, 1962, given by Nick and Alice Zadorkin "to Mike Zadorkin and Madelyn Zadorkin, his wife" conveying a lot in the Azevado River Subdivision in Sacramento County. Nick testified that Mike told him that he sold the property for $12,000 "in the late 70's - more like '78- '79--somewhere in there." Petitioners contend that this $12,000 should be included in Mike's assets as of the date of the transfer. We are not persuaded by this vague hearsay testimony that Mike owned the Sacramento property on July 24, 1978, the date of the transfer of the Seaside Drive property, or that he sold it for $12,000. We observe that there is no reference to the Sacramento property in the fairly detailed petition or in petitioners' reply to the answer. We give great weight also to the absence of any reference to this property in Mike's March 30, 1979, financial statement to the IRS. Had Mike received $12,000 from the sale of the property between July 24, 1978 and March 30, 1979, we think his financial picture would have been hardly as bleak as the Form 433-AB statement makes it appear. Further, Mike's former wife, Madelyn was co-owner of the Sacramento County *528 property, according to the June 16, 1962, deed. Mike and Madelyn were divorced several years before he died, [8] according to the testimony, and it is likely that the property was sold or their interests were severed at the time of the divorce. Finally, although section 6902 places the burden of proving insolvency on respondent, petitioners' allegations as to the Sacramento property do not appear from the trial record to have been brought to the attention of respondent prior to the trial. We think respondent established a prima facie case of insolvency and petitioner had the burden of establishing the ownership and value of the Sacramento property and the date and details of its sale.Petitioners' vague oral testimony on this point could be given credence only if corroborated by documentary evidence, ordinarily easily obtainable with respect to real estate, as to the date and consideration for the sale of that property. *529 3. Reasonableness of Respondent's Efforts to Collect the Deficiencies from the Transferor
Because transferee liability under section 6901 is a secondary liability, respondent must show that "all reasonable efforts were made to collect the tax liability from the transferor before proceeding against the transferee." Sharp v. Commissioner,35 T.C. 1168, 1175 (1961); Ginsberg v. Commissioner,305 F.2d 664, 669 (2d Cir. 1962), affg. 35 T.C. 1148 (1961). Were, as in this case, the transferor is hopelessly insolvent, the creditor is not required to take useless steps to collect from the transferor. The reasonableness of the collection efforts depends upon the facts of the individual case. The record is not entirely satisfactory on this issue. A portion of the file on the collection efforts made by the IRS officials was lost in, or was described as "irretrievable" from, a storage center and was not available to the witness from the IRS Collection Division who testified at trial.The record does show, however, that Mike did not file returns *530 for 1973 through 1977, and the Collection Division began an investigation in June 1977 which ultimately led to his filing returns for those years on March 30, 1979. At that time, the IRS agents obtained the Form 433-AB which indicated that he had income of $217 per month in excess of living expenses. At that time, Mike signed an agreement calling for payment of part of the excess on his unpaid liabilities. The record further indicates that collection officers made at least two other calls on Mike. A collection officer followed up and updated the financial statement on January 25, 1980.A collection officer's report of May 2, 1980, prepared as a result of a third call at Mike's home, contains the following notation: Financial statement secured from taxpayer 3-30-79. Part Payment agreement entered into at that time. Taxpayer unable to keep agreement due to illness. We think these personal contacts reflect reasonable collection efforts. Petitioners argue, however, that these three personal calls on Mike do not show that the IRS made a reasonable effort to collect Mike's unpaid taxes. As evidence, petitioners point out that a lien was not filed against the Seaside Drive *531 property. Under section 6322, a lien for Mike's taxes did not arise until the taxes were assessed on April 11, 1979. Before that date, Mike made the July 24, 1978, transfer of the Seaside Drive property to Nick. Thus, the IRS could not have placed a lien on the Seaside Drive rpoperty. Petitioners also argue that the IRS should have placed a lien against the Sacramento County property. Mike's Form 433-AB, however, did not mention any such property. According to the testimony of an agent of the Collection Division, an IRS microfiche system will currently permit a scan of the records of other counties but did not do so when Mike's case was handled. The IRS could hardly be expected to record liens in counties in which its Collection Division had no knowledge of any land ownership. Moreover, as discussed above, we are not convinced that Mike owned any land in Sacramento County when the transfer was made. The March 30, 1979, Form 433-AB does make reference to a lot in San Luis Obispo followed by the words "possibly for sale." The Collection Division officer testified that standard office procedure called for the collection officer who obtained the Form 433-AB to file a lien against *532 that property if the lien could be recorded prior to the completion of the sale. The agent frankly testified that she did not know whether such a lien was filed against the San Luis Obispo property, but she had no information indicating that the standard procedure was not followed in Mike's case. According to the revenue officer's May 2, 1980, report Mike "sold the property in San Luis Obispo reported on original 433AB and received only $738.94." The record shows that after the March 30, 1979, Form 433-AB was obtained the IRS collected $901 from Mike and applied it against the taxes, additions to tax, and interest for 1973 and 1974. The record does not show whether this $901 came entirely from the monthly payments Mike agreed to make or in part from the sale of the San Luis Obispo property. We do not think this $901 came from monthly payments; the $217 monthly excess of income over expenses shown on the Form 433-AB appears to have been an exaggeration because, it is stipulated, Mike had gross income of only $1,798 in 1978. In view of the precise amount of $738.94, stated in the IRS report to have been received from the sale of the San Luis Obispo property, we think it only reasonable *533 that the figure was obtained from a written document. Based on all of the evidence, we find that the standard collection procedure was followed in Mike's case and that the IRS placed a lien on the San Luis Obispo property and collected the proceeds of its sale. We find the IRS made a reasonable effort to collect the deficiencies from Mike. [9]
To reflect the foregoing, Decision will be entered under Rule 155. *534 Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted. All Rule references are to the Tax Court Rules of Practice and Procedure unless otherwise noted.↩
2. The IRS was a creditor of Mike for all 6 years on July 24, 1978, the date of the transfer of the Seaside Drive property, because his tax liability was ascertainable for 1973 through 1977 and was contingent for 1978. California law provides that liability due to a fraudulent conveyance attaches to unmatured and contingent liabilities. Cal. Civ. Code secs. 3439.01, 3439.02, 3439.10 (West 1970); see also Scott v. Commissioner,117 F.2d 36 (8th Cir. 1941); Kreps v. Commissioner,351 F.2d 1, 10 (2d Cir. 1965), affg. 45 T.C. 660 (1964); Freeman v. La Morte,148 Cal.App.2d 670, 307 P.2d 734, 738 (1959). If Nick is liable as a transferee, Alice Zadorkin is also liable because she did not give the fair equivalent of the interest transferred to her. See Cal. Civ. Code sec. 3439.03(a)↩ (West 1970). Petitioners make no separate arguments as to Alice.Her separate liability will not be further discussed.
3. Art. XIIIA of the California Constitution (West 1985) states: Section 1. (a) The maximum amount of any ad valorem tax on real property shall not exceed one percent (1%) of the full cash value of such property. * * * Section 2. (a) The full cash value means the county assessor's valuation of real property as shown on the 1975-76 tax bill under "full cash value" or, thereafter, the appraised value of real property when purchased, newly constructed, or a change in ownership has occurred after the 1975 assessment. * * *↩
4. Whether there was such an oral agreement is not at all clear. The Form 433-AB, as stated above, contains a notation by Mike: "Am living there at no rent at present," thus indicating that he did not retain such a right.↩
5. The current regulations ( sec. 1.1014-5(a)(2), Income Tax Regs.↩; sec. 20.2031-10(f), Table A(1), Estate Tax Regs.) applicable with respect to a male 56 years of age, fixes the value of a life estate at .60466 and a remainder interest at .39534 of the value of the property. Using that decimal fraction, the value of a remainder interest in property with a value of $35,000 would be $13,836.90 and with a value of $60,000 would be $23,720.40.
6. See Nader v. Commissioner,323 F.2d 139, 142↩ (7th Cir. 1963), affg. a Memorandum Opinion of this Court, sustaining transferee liability measured by "the difference between the actual consideration and the fair market value [of the transferred assets] to the extent of the income tax deficiencies" plus interest.
7. The income tax liability of $146.73 for 1978 had not accrued as of the date of the transfer in July 1978.↩
8. On brief, petitioners suggest that Madelyn, Mike's former wife, "may have had assets, which would have been subject to attachment for payment of the taxes in question," and they complain that respondent has presented no evidence to show that any attempt was made to collect from her. We are not convinced that Mike and Madelyn were husband and wife during the years in controversy; there is no suggestion that Mike's gross income in 1973 through 1978, stipulated by the parties, was only his share of the community income. Because Mike and Madelyn did not file joint returns for any of the years in question, Madelyn is not in any way liable for Mike's taxes.↩
9. Petitioners' brief contains an argument that they are not liable for interest on Mike's liabilities. Where the value of the transferred property exceeds the unpaid liabilities of the transferor, the transferee, however, is liable for the entire deficiency of the transferor, including the deficiency in tax, additions to tax, and interest thereon. Lowy v. Commissioner,35 T.C. 393, 397 (1960); Estate of Glass v. Commissioner,55 T.C. 543, 575-576↩ (1970). Because the value of the Seaside Drive property far exceeded Mike's liabilities for taxes, additions to tax and interest, we find no merit in petitioners' argument as to interest.