IRVING S. FEDERBUSH AND SYLVIA C. FEDERBUSH, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 41930, 41931, 66600, 69574. Filed July 29, 1960.

*Burnett Schwartz, Esq., Morris A. Shenker, Esq.,* and *Bernard J. Mellman, Esq.;*[2] *Harry Malter, Esq.,* and *George V. Delson, C.P.A.;*[3] and *Morris A. Shenker, Esq.,* and *Bernard J. Mellman, Esq.,*[4] for the petitioners.

*John J. O'Toole, Esq.,* and *John J. Madden, Esq.,* for the respondent.

---

[1] The proceedings of the following petitioners are considered herewith: Jack D. Federbush (also known as Jay D. Federbush), Docket No. 41931; the Federbush Company, Inc., Docket No. 66600; and Sylvia Federbush, Docket No. 69574.

[2] Counsel for the petitioners in Docket No. 41930.

[3] Counsel for the petitioner in Docket No. 66600.

[4] Counsel for the petitioner in Docket No. 69574.

OPINION.

Turner, *Judge:* Except for Docket No. 69574, each of these cases involves the tax consequences of the distribution or division of funds

of the Federbush Company by and between its officer-stockholders without formal action as directors of the company and without recording the distributions on the corporate books.

With respect to the Federbush Company, the assessment of the deficiencies and the additions to tax for fraud is barred by the statute of limitations unless the returns were "fraudulent * * * with intent to evade tax," within the meaning of section 276(a) of the Internal Revenue Code of 1939.[7] Respondent has the burden of proving that such intent existed.

During the taxable years in issue the president of the corporation supplied false information to the accountant who prepared the corporate tax returns. As a result, the returns contained omissions of sales and rental income and deductions for fictitious purchases. The president, as well as the other corporate officers, was aware of the falsity of the returns. These returns were signed by the president and the signing of income tax returns was within the scope of his duties and authority. Under such circumstances, the evidence that the returns were filed by the corporation with fraudulent intent to evade tax is clear and convincing.

Nevertheless, the corporation contends that the fraud of its officers may not be imputed to it. This contention, however, does not take into account the fact that a corporation can act only through its officers and that it does not escape responsibility for the acts of its officers performed in that capacity. Corporate fraud necessarily depends upon the fraudulent intent of the corporate officer. *Auerbach Shoe Co.* v. *Commissioner*, 216 F. 2d 693, affirming 21 T.C. 191; *Currier* v. *United States*, 166 F. 2d 346; *Saven Corporation*, 45 B.T.A. 343; and *L. Schepp Co.*, 25 B.T.A. 419. Where, as here, the fraudulent intent was on the part of all of the corporate officers who in addition owned five-sixths of the stock, the application of section 276(a) is manifest.

The Federbush Company no longer contends, as it did at the trial, that the unrecorded sales and rental income was the income of the Federbush brothers individually rather than of the corporation, but instead seeks deductions of corresponding amounts under section 23(f) of the 1939 Code,[8] on the theory that these funds, as well as the amounts taken through fictitious purchases, were embezzled by its officers.

---

[7] SEC. 276. SAME—EXCEPTIONS.

(a) FALSE RETURN OR NO RETURN.—In the case of a false or fraudulent return with intent to evade tax or of a failure to file a return the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time.

[8] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

* * * * * * *

(f) LOSSES BY CORPORATIONS.—In the case of a corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise.

We do not have here the case of merely an employee who steals money which has been entrusted to his care by his employer. The Federbush brothers were controlling stockholders, completely in charge of the management of the corporation, who acted in concert and with mutual agreement to divide and distribute corporate funds among themselves and to their own unrestricted use and enjoyment. All of this they were able to do because of their ownership and their control of the corporation. That they were making the distributions between themselves under claim of right receives corroboration from their resistance in the suit brought against them by Regina and Natalie and their subsequent acts in attempting to defeat the judgment obtained on behalf of the corporation. As officers and stockholders, they could have formally authorized either dividend distributions or liquidating distributions,[9] and we do not understand it to follow that the absence of formal authorization in such circumstances makes of the distribution an embezzlement. A distribution of corporate earnings may constitute a dividend even though the formalities of a dividend declaration are not observed, even though the distribution is not recorded on the corporate books as such, even though it is not in proportion to the stockholdings, and even though some of the stockholders do not participate in its benefits. *58th Street Plaza Theatre, Inc.* v. *Commissioner*, 195 F. 2d 724, certiorari denied 344 U.S. 820, affirming 16 T.C. 469; *Helvering* v. *Gordon*, 87 F. 2d 663; *Christopher* v. *Burnet*, 55 F. 2d 527; *Hadley* v. *Commissioner*, 36 F. 2d 543; and *Chattanooga Savings Bank* v. *Brewer*, 17 F. 2d 79.

Not only does the record indicate that the Federbush brothers had no intent to steal from the corporation, but rather, we think it reveals that they were interested primarily in reducing their taxes which was a more rewarding objective best accomplished through bypassing the corporate books with the corporate income. In this manner they would, if not detected, lighten the tax burden at both the corporate and shareholder level. Viewed realistically, the diversions had as their principal purpose the allowing of the corporate officer-stockholders to escape taxation by routing corporate income directly and secretly into their hands. Consequently, we have concluded that the funds received by the Federbush brothers were not embezzled from the corporation. See in that connection *Drybrough* v. *Commissioner*, 238 F. 2d 735, affirming on that point 23 T.C. 1105; *Kann* v. *Commissioner*, 210 F. 2d 247, certiorari denied 347 U.S. 967, affirming 18 T.C. 1032. See also and compare *Currier* v.

---

[9] Under New York law, power to declare dividends is vested in the majority of the corporate board of directors. N.Y. Gen. Corp. Law, sec. 27; *Liebman* v. *Auto Strop Co.*, 241 N.Y. 427, 150 N. E. 505. Moreover, a corporation may be dissolved without judicial proceedings upon the vote of two-thirds of its stockholders. N.Y. Stock Corp. Law, sec. 105.

*United States, supra,* and *United Dressed Beef Co.,* 23 T.C. 879.

Nor is the result otherwise because of the rights and interests of Regina and Natalie in the corporation. Based on stock ownership, the $100 per week they were receiving from the corporation was somewhat less pro rata than the amounts the five brothers were distributing to and dividing among themselves, but that fact does not, in our opinion, supply the basis for a loss deduction for the corporation. In passing, it may be noted that if the amounts received by Irving were as determined by the respondent, the amounts received by him in 1942 and 1945 exceeded the $5,200 received by Regina and Natalie in those years by only $1,420.12 in 1942 and $1,031.90 in 1945.

In holding that the corporation is not entitled to deductions for embezzlement losses, we have not disregarded the corporate entity. We have merely determined that the Federbush brothers did not have the requisite intent to embezzle from the corporation. Without such intent there can be no act of embezzlement.

Although cases such as *Currier v. United States, supra,* and *Ace Tool & Eng., Inc.,* 22 T.C. 833, may not be conclusive on the facts here since they involved diversions by sole stockholders while in this case the Federbush brothers owned only five-sixths of the stock of their company, the same underlying principle is in our opinion applicable. Under the rationale of those cases, it seems doubtful that a sole stockholder could ever intend to embezzle from his corporation. Whether a majority stockholder could have such an intent under some factual situations we need not decide here; it is enough to conclude that the Federbush brothers did not.

In support of its position, the corporate petitioner cites *Summerill Tubing Co.,* 36 B.T.A. 347. There the president of the corporation, who with his wife owned about 91 per cent of the outstanding common stock, diverted approximately $76,000 from the corporation through fictitious purchases. The corporation was allowed a deduction for the loss under section 23(f) of the Revenue Act of 1928.[10] Though the case is not entirely clear in this respect, the decision is evidently based on the premise that there was an embezzlement of funds from the corporation. No consideration appears to have been given, however, to the possibility that there may have been an informal distribution of corporate income by the controlling stockholder. Since we have concluded that the Federbush brothers did not intend to embezzle funds from the corporation, we do not regard *Summerill Tubing* as determinative of the case at hand.

---

[10] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

\* \* \* \* \* \* \*

(f) LOSSES BY CORPORATIONS.—In the case of a corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise.

Taking the position that the diversion of funds constituted embezzlement under the New York law, the petitioner corporation makes the further argument that whether for the purposes of the deduction claimed what occurred here was embezzlement depends upon applicable State law. This same contention was rejected by the United States Court of Appeals for the Third Circuit in *Kann* v. *Commissioner*, *supra*, and by the United States Court of Appeals for the Sixth Circuit in *Drybrough* v. *Commissioner*, *supra*. In the *Kann* case, the court stated that, "Such local law concept of embezzlement, while it may be useful to deter those in control of a corporation from defrauding creditors and minority stockholders, should not, in our opinion, be used as a vehicle for tax avoidance, absent a clear mandate to the contrary." Otherwise, as we have pointed out in *United Mercantile Agencies, Inc.*, 23 T.C. 1105, affirmed on this point sub nom. *Drybrough* v. *Commissioner*, *supra*, stockholders could avoid corporate and individual taxes by diverting corporate funds and then claiming embezzlement if discovered.

Having found that the corporate returns for the taxable years involved were "fraudulent * * * with intent to evade tax," we also hold that the deficiencies, or parts thereof, for such years were due to fraud with intent to evade tax, and the respondent was correct in determining the additions to tax for fraud under section 293(b) of the 1939 Code.

Irving now earnestly and urgently agrees with the corporate petitioner that beyond question he was guilty of embezzlement, and that *Commissioner* v. *Wilcox*, 327 U.S. 404, applies to relieve him of all tax on the distributions he and his brother-officer-stockholders made between themselves from the Federbush Company. What we have said above concerning the corporation's claim of a deduction is equally applicable here. Accordingly, there was no embezzlement within the meaning of the *Wilcox* case, and we hold that Irving is taxable on the funds distributed to him. Cf. *Rutkin* v. *United States*, 343 U.S. 130.

In *Wilcox*, the taxpayer was a salaried employee, not an officer and controlling stockholder. The Federbush brothers, on the other hand, controlled the corporation during the taxable years in issue, owning together 83⅓ per cent of its stock. They were also completely in charge of the corporate management. The taxpayer in *Wilcox* was indicted and convicted of embezzlement, while the Federbush brothers have never even been charged with that crime. Moreover, the taxpayer in *Wilcox* would never have received any of the proceeds of his wrongdoings except for his diversion, but in major portion the Federbush brothers were taking funds which they as stockholders had a right to have distributed to themselves. Their

primary purpose in diverting the corporate funds was to secure the tax advantages gained thereby.

For Irving, it is argued that the *Kann* case is distinguishable, in that there the acts of the two brothers were condoned and here they were not. We can see some differences in facts, but not in principle. In neither case did the nonparticipating stockholders prefer criminal charges, but in both cases steps for restoration were taken, the only difference being that in the *Kann* case when the disclosures were made the two officer-stockholders who had been distributing corporate funds to themselves worked out a program of payment with the other stockholders. In the instant case, the Federbush brothers instead of agreeing to make restoration as was done in the *Kann* case resisted, rather obviously under claim of right, the suit brought against them, and further, Irving, Jack, and Nathan undertook to defeat the judgment after it was rendered. When those efforts failed, Irving, Jack, and Nathan made settlement by turning in their stock. Samuel, on the other hand, as did the brothers in the *Kann* case, worked out a payment program. He did not give up his stock but put it in escrow as security. For the purpose here the end results in the two cases were in effect the same.

As related to this case, it might seem at first glance that the opinion of the Third Circuit in *Kann* and that of the Second Circuit in *J. J. Dix, Inc.* v. *Commissioner*, 223 F. 2d 436, certiorari denied 350 U.S. 894, reversing in part a Memorandum Opinion of this Court, are in conflict, and that the *Dix* case stands in support of Irving's claim that as to him the *Wilcox* case controls. Jacob Dix, the president of a family corporation, without the knowledge, authorization, or consent of the directors or other officers, withdrew and appropriated certain corporate funds to his own benefit. And in deception of his son, the only other responsible corporate officer, Jacob failed to record certain sales in the corporate books. The Court of Appeals for the Second Circuit, while sustaining the holding that the unrecorded items did represent corporate income, held, by a divided court, that the misappropriated funds did not constitute taxable income to Jacob, stating:

Jacob withdrew those moneys from the corporate bank accounts without the consent, coerced or otherwise, of the company. That he was the president did not amount to corporate consent. We have here a simple case of embezzlement, not one involving a receipt under any color of right. Accordingly, we think *Commissioner of Internal Revenue* v. *Wilcox*, 327 U.S. 404, 66 S. Ct. 546, 90 L. Ed. 752, governs, and that *Rutkin* v. *United States*, 343 U.S. 130, 72 S. Ct. 571, 96 L. Ed. 833, does not apply. We do not believe that *Rutkin* completely obliterated *Wilcox*. * * * In the instant case, the facts are close to those of *Wilcox*, and lack the distinguishing features found in *United States* v. *Bruswitz*, 2 Cir., 219 F. 2d 59, and cases there cited. See also the dissent of Judge Kalodner in *Kann* v. *Commissioner*, 3 Cir., 210 F. 2d 247, 253.

Unlike the *Dix* case, where the taking was by a corporate officer who although having the voting rights in one-fourth of the outstanding stock and by irrevocable trust was entitled for life to the dividends from such one-fourth of the stock, actually owned none of the stock outright, the taking in the instant case of the sales receipts, rents, and the like and the division thereof was by and between individuals who were not only the owners of 83⅓ per cent of the corporate stock, but constituted the entire board of directors. It is our view that the *Wilcox* rule does not apply and on the facts here that the *Dix* case does not call for or require its application.

Since Irving has stipulated that the additions to tax for fraud should apply if the diverted funds were held to be taxable income to him, discussion of the fraud issue is unnecessary.

In his determination the respondent included in Irving's taxable income for the years in issue the amount of $66,657.40 as the result of his diversion of funds from the Federbush Company. Of this amount, the respondent allocated $28,494.12 to dividend income and $38,163.28 to long-term capital gains. The allocation indicates that the respondent has determined that the diversions by the Federbush brothers exceeded the corporate earnings and profits as well as their basis for their stock, although there is no evidence of record as to either the amount of accumulated earnings and profits or the basis of the stock. Irving has raised no question as to the respondent's allocation, however, and we are asked to decide only the total amount diverted by him. It is Irving's position that the amount does not exceed $43,000. This figure is comprised of $25,000 received from Max, "between seven and eight thousand dollars" diverted by Irving, and $10,000 as Irving's share of a United States Government bond purchased with funds diverted from the corporation.

Other than his vague unsupported testimony, Irving has failed to produce any evidence to overcome the presumption of correctness accompanying the determination made by the respondent. Though conceding that he received approximately $43,000 of diverted funds, Irving has not broken down this amount by years, or otherwise justified a finding by us of the lesser amount. He has failed to keep any records, although under the statute he was required to do so. His testimony leaves us entirely in the dark as to all of the essential details concerning the amount diverted. Under the circumstances, we hold that Irving has failed to overcome the presumption of correctness to which the respondent's determination is entitled under the law. See *Prokop* v. *Commissioner*, 254 F. 2d 544, affirming a Memorandum Opinion of this Court.

Sylvia contends that the returns filed for 1942 through 1946 and for 1948 were not joint returns and that she is not liable for any

part of the deficiencies and additions to tax found to be due for those years.

Under section 51(b) of the 1939 Code,[11] if a joint return is filed by a husband and wife living together, they are jointly and severally liable for the full tax liability. Such liability covers not only the tax itself but also any addition to the tax on account of fraud, notwithstanding that the wife may have signed the return in blank or that she was innocent of the fraud. *Myrna S. Howell*, 10 T.C. 859, 866, affd. 175 F. 2d 240, and *Dora S. Hughes*, 26 T.C. 23, 28, 29.

On their face, the returns were the joint returns of Irving and Sylvia Federbush. All of the returns, except for 1944, were signed both by Irving and by Sylvia. The 1944 return was signed by Irving both for himself and Sylvia. The full credits or exemptions for three dependent children and for husband and wife were claimed on each return. Only one return for each year was filed. In none of the years did Sylvia file a separate return.

It is Sylvia's contention that she signed the returns under duress, and such being the case, the returns filed even though in joint names were not joint returns and were not her returns. For support of this contention, she relies on her own testimony to the effect that she did not know that she was signing income tax returns at the times when they were signed by her; that she signed anything her husband asked her to sign; and that in asking her to sign documents his tone was abusive. She also relies on her testimony to the effect that during the period the returns were signed, she and Irving were having personal difficulties and that during the same period she was under doctor's care and for a part of the period, at least, was undergoing psychiatric treatment. As supporting her testimony that the returns were signed under duress, she relies on the testimony of Irving that he had never given her any explanation, but would tell her to sign them "or else."

Since, except for 1944, the returns filed were admittedly signed by both Sylvia and Irving, the question is as to their purpose and intent in so signing and filing them. Such being the case, we listened most attentively to their testimony as it was being given and carefully observed them while they were testifying, and we are convinced that the idea of disavowing the returns as joint returns was an afterthought. Not only is there nothing of record to indicate that Sylvia at any time opposed or resisted the thought or

---

[11] SEC. 51. INDIVIDUAL RETURNS.

(b) HUSBAND AND WIFE.—A husband and wife may make a single return jointly. Such a return may be made even though one of the spouses has neither gross income nor deductions. If a joint return is made the tax shall be computed on the aggregate income and the liability with respect to the tax shall be joint and several. No joint return may be made if either the husband or wife is a nonresident alien or if the husband and wife have different taxable years. The status of individuals as husband and wife shall be determined as of the last day of the taxable year.

idea of making and filing joint returns, but to the contrary, the evidence has convinced us and we have found as a fact therefrom that in signing the returns Sylvia intended the signature to be her signature and to have effect as such on the returns filed.

Sylvia did not participate in the management and operation of the Federbush Company nor, according to the testimony, in any other business transactions. Irving looked after all such matters, and when he brought papers and documents to her for signature, it was, according to her testimony, her practice to sign them, "whether they were income tax returns or any other papers." It was Irving's testimony that he regarded himself as the breadwinner and if Sylvia's signature was necessary, he felt it was her duty to sign. According to Irving, Sylvia did not understand tax returns and he just gave them to her to sign, because the accountant had told him that he had made them out in "duplicate" form and that they would have to be signed both by him and by Sylvia.

Although it may not be conclusive, the inclusion in the return of income and deduction items of the wife has been regarded as a factor supporting the conclusion that the return was the joint return of husband and wife, *Myrna S. Howell, supra; Elsie S. Bour*, 23 T.C. 237; and *Walter M. Ferguson*, 14 T.C. 846. At one point in her testimony, Sylvia, when asked whether to her knowledge she had taxable income, responded, "Not to my knowledge." At another point, she said she had no income. We will proceed on the premise that the last mentioned statement was correct.[12]

With respect to the existence of items of deduction, the situation appears to have been otherwise. The facts show that in each and every year deduction was claimed for real estate taxes, and, so far as appears, Sylvia was the only one of the two who owned real estate. First the home in Monroe and next the home in Great Neck was shown to have been in her name, and it has been held that taxes paid by a husband on real estate occupied by himself and his wife as a home and owned by her and held in her name may not be deducted in the husband's separate return, even if he has given the property to her. *Myrna S. Howell, supra*, and *William Ainslie Colston*, 21 B.T.A. 396, affd. 59 F. 2d 867, certiorari denied 287 U.S. 640. See also *Inez H. Brown*, 1 T.C. 225. It is to be noted that except for 1948, all of the years herein were prior to the Revenue Act of 1948, the statute which granted to a husband and wife the current tax computing advantages where a joint return is filed, and for years prior to 1948, the advantage of a joint return was all the

---

12 Included in income in each return was an item of interest which has not been explained or otherwise identified. It was brought out in Sylvia's testimony that she did maintain one or more savings accounts. In that connection, she described herself as trustee for her children. Whether the accounts were so carried according to the passbook or passbooks does not appear.

more obvious, where the joining of the wife would bring additional deductions, as well as the dependency credit, to the return without any increase in gross income.

The evidence to support the claim of duress is to us neither convincing nor persuasive. In substance, it is limited to Sylvia's testimony that Irving's tone was abusive and Irving's statement that he did not explain anything to her, but would tell her to sign "or else." It does appear that Sylvia did not like living in Monroe, and we have no reason to doubt that for various periods of the time herein she was under a doctor's care and at various times received psychiatric treatment. Although according to Irving they had their ups and downs, it is to be noted that at all times material hereto they lived together as husband and wife, and have since continued to do so. There was no testimony of any specific incidents at the time of signing the returns which were signed by Sylvia. In fact, it was Sylvia's testimony that she did not know she was signing income tax returns, which, if the matter was of critical importance, we would be extremely hard pressed to believe; that is, if our impressions of Sylvia's alertness and intelligence as they appeared to us in the course of her testimony are to be taken into account. But whether she had little or extensive knowledge of the papers presented to her for signature, it was her practice to sign them when presented, whether they were income tax returns or any other papers, and we are not in doubt that she intended the signature made as her signature and to have effect as such. We are satisfied that the returns were not signed under duress.

The facts relating to the making and filing of the 1944 return are different, in that Irving signed Sylvia's name as well as his. It has been held that there can be a binding joint return even though one of the spouses failed to sign it, provided it was intended to be a joint return. *Joseph Carroro*, 29 B.T.A. 646, 650; *Myrna S. Howell, supra; Kann* v. *Commissioner, supra,* and *Muriel Heim,* 27 T.C. 270, affd. 251 F. 2d 44. The record indicates that the 1944 return was prepared as a joint return in the same manner as the returns for other years. It so happened that when Irving presented the return to Sylvia for her signature they were experiencing some personal difficulties and she had refused to sign several other documents. She also refused to sign the return, and since the refusal was on the last day for the filing of the return, Irving signed her name to the return in her stead. There is no indication of record, even in Sylvia's own testimony, that her refusal to sign the return was because she did not wish to file a joint return or that she did not intend for it to have effect as a joint return when it was signed for her by Irving and filed. While we regard the situation relating to the filing of the 1944 return as a closer question, on the facts,

we are persuaded that Sylvia's refusal to sign was due to matters wholly unrelated to the filing of the return and that she had no intention that the 1944 return should actually be different from the returns filed for other years.

We conclude and hold that the returns for all of the years here in question were the joint returns of Irving and Sylvia, and under section 51(b), *supra*, their liability thereunder is joint and several.

With respect to Jack Federbush, the burden is on the respondent to prove by clear and convincing evidence that the deficiency, or a part thereof, for each of the taxable years was due to fraud with intent to evade tax. On the basis of all of the conditions and circumstances surrounding the diversion of funds, we have concluded that the deficiencies determined against Jack, or a part thereof, were due to fraud with intent to evade tax.

Jack was at various times during the taxable years involved, president, secretary, and sales manager of the Federbush Company. Like his brothers, he owned one-sixth of its stock and participated in the scheme to make informal distributions. The understatements of income plainly were not the result of his ignorance, oversight, or lack of comprehension. Moreover, none of the diverted funds were reported in Jack's income, although the amount taken was a substantial sum. The failure to report these diversions over a period of successive years strongly evidences an intent to defraud. *Rogers v. Commissioner*, 111 F. 2d 987. Finally, the taking of the proceeds of unrecorded sales and rental income indicates an attempt to evade tax by concealing a source of income. See *Spies v. United States*, 317 U.S. 492.

The circumstances set forth above clearly evince a pattern of willful failure to report income. We are convinced that the deficiencies against Jack were due, at least in part, to fraud, and we so hold.

*Decisions will be entered under Rule 50.*