ARC ELECTRICAL CONSTRUCTION CO., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
ARC ELEC. CONSTR. CO. v. COMMISSIONER
Docket Nos. 6692-82; 20563-82.
United States Tax Court
T.C. Memo 1988-592; 1988 Tax Ct. Memo LEXIS 621; 56 T.C.M. (CCH) 975-3; December 29, 1988; As amended December 30, 1988; As amended January 9, 1989 Paul Friedman, for the petitioner. Kevin M. Flynn, for the respondent. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined the following deficiencies and additions to tax against petitioner: Addition to Tax
Year
Deficiency
Sec. 6653(b) [1]
1974
$  55,676
$  27,838
1977
951,315
475,658
After concessions by the parties the only substantive questions for the Court to decide are whether petitioner suffered an embezzlement loss of over $ 13 million in 1980, which can be carried back to the 1977 taxable year and/or whether the tax deficiencies in 1974 and 1977 are attributable to fraud. [2]
*623 There are certain things missing in this case which make it both difficult and interesting -- namely over $ 6 million in cash stolen by William Callahan; and William Callahan, who was found murdered in Kenosha County, Wisconsin on March 18, 1981. As the questions involved in this case imply, our task is to determine whether Arc Electrical Construction Co. (Arc or petitioner) was involved in a scheme to fraudulently deprive the government of taxes due and owing; or whether Arc was, like the government, a victim of fraud. To make the determination in this case there are a few facts and certain relationships which must first be explained and understood. FINDINGS OF FACT To begin with, Arc was incorporated in 1921. One of the original founders was Charles Rao, Chairman of the Board at Arc during the 1970's and at least the first part of the 1980's, including the years in issue. The shareholders at Arc have changed somewhat since 1921. However, at all times relevant to our discussion Arc was a closely held family corporation which was doing a large amount of electrical contracting work in and around New York City. Every shareholder at Arc was related to Rao either by blood *624 or through marriage. This was also true of the five directors of Arc. Rao had three daughters -- June, Eleanor and Edith. All three of his daughters married. June married Alfred P. Minervini (Minervini). Minervini came to work at Arc and both he and June were shareholders of and served as directors to Arc. In addition, Minervini was the president of Arc, during all times relevant to the Court's inquiry. Minervini was involved in the production aspect of Arc's business. Eleanor married William Callahan (Callahan) -- the thief and murder victim -- who likewise came to work at Arc. Both William and Eleanor Callahan were also shareholders and directors of Arc. Callahan served as secretary/treasurer of Arc and was responsible for most of the day-to-day operations at the company. Edith married Anthony Pope. Unlike Rao's other sons-in-law, Anthony Pope is not and was not involved with Arc. He is neither a shareholder nor a director. Edith Pope, however, is both a director and a shareholder of Arc. Rao's three daughters also had children of their own. Each of the children in this "third generation" are also shareholders of Arc. In addition, William H. Callahan (Callahan *625 Jr.), Eleanor and William Callahan's son, and Grant Stinchfield, June and Alfred Minervini's son-in-law, worked at Arc. When Callahan Jr. started he was only an estimator in training. As he grew older he was given more responsibility and eventually he became an officer (secretary) of Arc. Grant Stinchfield, who is a licensed master electrician, served as vice-president/secretary at Arc until November 1977. As we said, Callahan stole over $ 6 million in cash from Arc between 1977 and 1980. In September of 1980 Callahan was forced to resign. The theft led to Callahan's demise at Arc, and for all we know may have led to his ultimate demise as well. Callahan was the "big man" at the company. He was the one mostly concerned with the daily operations at Arc. He was also in charge of public relations and brought in a great deal of the company's business. Callahan had the authority to sign Arc checks. In fact, bills at Arc were not even paid until one of the "higher up" executives initialed that the bill was "okay to pay." Callahan also had access to the company's books and records. The scheme which gained him over $ 6 million in cash did not require him to alter the company's *626 books and records after the fact in order to cover his theft; rather his cover-up of the theft started at the beginning of the process. Callahan would get either a blank or fictitious invoice from one of his cohorts outside of Arc. The accomplice would direct the invoice through the normal procedure at Arc, i.e., to the accounting department. Later, when asked, Callahan would initial the bill as "okay to pay." The check was then drawn up by either the accounts payable department or by Callahan. Then Callahan signed the check, which was paid to Callahan's "partner in crime" outside of Arc. The accomplice would negotiate the check, keep a percentage of the proceeds, and return the rest to Callahan. One of the people with whom Callahan conspired was David Weiss (Weiss). Weiss owned various retail appliance stores in New York City. Two of his companies were Econoby Buying Service and Econoby Export Ltd. The government's special agent Gross estimated that between 1977 and 1980 Callahan was able to steal between $ 3,000,000 and $ 3,400,000 in cash from Arc using his association with Weiss and these two companies. Callahan was able to steal another $ 1.4 million during the same *627 period using his association with Weiss and Baitinger Electric. Callahan's other check cashing connections were Dollar Electric and Central City Electric. Through these companies he was able to get another $ 1 million in cash. For the most part, Callahan's theft did not require any accomplices at Arc. Upon occasion, however, William Bruno (Bruno), the office manager, typed the fictitious invoices at Callahan's direction. None of Arc's other shareholders, directors, officers or employees participated in this check cashing plan. The other officers were involved in different schemes. Some of these schemes also involved Callahan. One other plan did not include Callahan, but ran concurrently with a parallel scheme of his. Callahan implemented a scheme whereby several officers and employees at Arc would receive additional cash through the use of false petty cash vouchers. Although Callahan conceived the idea, John DeFabritus (DeFabritus), an unrelated vice president at Arc; William Feraudo (Feraudo) and Ceasar Santorelli (Santorelli), two of Arc's project managers; and William Bruno all received the petty cash. The employees perceived the petty cash as salary supplements to *628 compensate for what they believed to be wholly inadequate salaries at Arc. Even though the employees believed the petty cash was compensation, none of the officers declared the amounts received as income on their individual tax returns. Neither did Arc pay any FICA taxes on these amounts. [3]
This false petty cash system was very effective because it operated exactly the same as the company's legitimate petty cash system. The employee would submit the petty cash voucher on the same day each week and then a separate check would be drawn to repay the amount of the voucher. Eventually the petty cash amounts were included in the employee's payroll check. The amount each person received in petty cash varied with the person's position at the company and his tenure. Apparently none of the related officers at Arc were aware of the false petty cash scam involving "increased salaries" when the scheme began or even while Callahan was still working at Arc. However, Rao, Minervini *629 and Callahan Jr. continued to approve the false petty cash vouchers for approximately six weeks after Callahan left Arc. At that point the Internal Revenue Service (IRS) had already begun its investigation. The officers directed Bruno to stop the petty cash payments. Thereafter Arc raised the salaries of the affected employees to compensate for the loss in petty cash plus the increase in each individual's tax liability. Callahan also personally benefitted from the false petty cash system. It was another way in which he was able to get cash from the company. There is no clear evidence, however, as to how much cash Callahan received from false petty cash. Another use of the false petty cash system was to fund the company's "slush fund." It is no big surprise that Callahan also had a hand in the development and operation of the slush fund. The slush fund was used to pay certain city inspectors, insurance underwriters and workers at job sites to do their work "more expeditiously." Unlike some of the other schemes involving Callahan, the slush fund operated with the knowledge, and we assume, approval of other "high level" executives at Arc. At least on some occasions Rao actually *630 authorized the negotiation of certain checks to fund the slush fund. Callahan Jr. also submitted false petty cash vouchers at his father's request. The funds Callahan Jr. received were returned to Callahan and either remained in Callahan's pocket or were contributed to the slush fund. Other officers, notably Minervini, Feraudo and Santorelli, used the slush fund. On those occasions the other officers usually approached Bruno, who actually kept the petty cash in his office. These officers would take money from the fund at a couple of hundred dollars at a time. Santorelli and Callahan Jr. also received bonuses from Arc which were not recorded on Arc's books. They each received quarterly checks from a company called Oxford Travel, Inc. The relationship between Arc and Oxford Travel, Inc. is not clear; however, Santorelli and Callahan Jr. received these checks, drawn on an Oxford Travel, Inc. checking account from their employer, Arc. It may be that other Arc employees received similar bonuses, but that is not apparent from the record. The other scheme at Arc was really two parallel schemes -- one involving Minervini, the other involving Callahan -- which probably continued *631 for the longest period of time. These schemes were more widespread than the ones discussed above. These schemes benefitted many of Arc's shareholders who were not employees and who did not directly participate in the diversion of funds, but who were related to those who did. As far back as 1969 Arc has paid some of the personal expenses of its higher level employees. Arc did not treat these personal expenses as compensation, but as part of its cost of goods sold expense. Callahan and Minervini primarily benefitted from the plan. These two men, who according to Minervini were not at all social with one another, did not appear to conspire together in order to divert funds for their own benefit. We do not, however, dismiss the possibility they conspired with others, including petitioner. Each man used identical methods, and the expenses Arc paid for each of them were remarkably similar. Rao knew or approved of at least some of these expense payments. Both Minervini and Callahan had home construction paid for by Arc. They assigned an Arc job number to each invoice related to the construction. Arc was on the completed contract method of accounting. Each of the expenses *632 corresponded with an Arc job and was recorded in a job book. The total amount of the costs associated with the job were deducted once the job was completed. The scheme was designed to avoid detection by employees and outsiders. Under the completed contract method, expenses would accumulate for years before any deductions were actually taken. The construction and payment plan was not a one time occurrence for the benefit of two of Arc's highest level employees. Rather, this type of scheme, with various minor alterations, went on for years at Arc. Over a period of years, Arc spent at least $ 180,000 for Minervini's benefit. Minervini had an addition to his house paid for by Arc. Minervini also saw to it that his daughter and son-in-law, June and Grant Stinchfield, benefitted from the scheme. He arranged for work to be paid for by Arc on two of their homes. In 1977, Arc paid for and deducted several personal expenses of Minervini and Stinchfield, when both were officers. Minervini benefitted to the extent of $ 49,391.96 and Stinchfield to the extent of $ 16,199.01. During 1977 Minervini actually had Arc pay for (1) the construction of an addition onto his East Hampton *633 home; (2) architectural plans for his Long Island home; (3) miscellaneous other household improvements; (4) electrical work on his Long Island home; (5) levelor blinds and draperies; (6) antiques; (7) household fixtures; (8) home heating oil; (9) home heating oil at his daughter and son-in-law Kuhnt's home; (10) a sprinkler system for his Long Island home; and (11) eyeglasses and contact lenses. In addition, Minervini helped to have the following expenses and renovations of Stinchfield paid for by Arc: (1) lawn service at Stinchfield's Connecticut home; (2) landscaping at his Connecticut home; (3) home heating oil; (4) bathroom tiles for his Connecticut home; (5) roof shingles for the Connecticut home; (6) kitchen cabinets and other kitchen renovations; and (7) carpentry work in his Scarsdale home. Stinchfield and Minervini were not the sole beneficiaries of these expenditures. The family members who lived in the homes or had other personal expenses paid by Arc also benefitted from the plan. The other family members who benefitted were all shareholders of Arc. Callahan also had a home built and paid for by Arc. But that is an understatement. It is much more accurate to say *634 that Callahan had several homes for himself and others (including his girlfriend) built and paid for by Arc. Callahan had homes built for himself in New Rochelle, Lake Placid, and Montauk, New York, paid for by Arc. Arc also paid for Callahan's or his girlfriend's co-op apartment in New York City. Callahan had a home for his girlfriend built and paid for by Arc in Montauk, New York. Callahan also caused Arc to pay for renovations on Callahan Jr.'s apartment in New York. Finally, Callahan arranged to have a house built and paid for by Arc for John DeFabritus in Montauk, New York. The discussions about the homes built at Callahan's direction only provides a background or insight into how pervasive the diversion of funds was at Arc. None of the above-mentioned expenditures were deducted by Arc in either 1974 or 1977. Arc did, however, make $ 339,911.38 in expenditures on Callahan's behalf in 1977. Of this amount approximately $ 296,000 was cash for Callahan. The remaining approximately $ 42,000 purchased household furnishings, radio and television items, carpeting, domestic services and electricity for the New Rochelle and Long Island homes. Obviously, Callahan's wife Eleanor *635 also benefitted from the material expenditures. We also find that Callahan Jr. also benefitted from some of the expenditures as well. Between 1973 and 1980 Callahan Jr. received between $ 17,000 and $ 30,000 of electronic equipment from his father's association with David Weiss. Some portion of that purchased equipment was deducted by Arc in 1977. According to petitioner, Callahan Jr. came to Arc's rescue on the financial front by uncovering his father's embezzlement. Petitioner claims that the actions of Minervini amounted to another theft from Arc, discovered later. Callahan Jr. began working at Arc in 1972 when he was 18 years old. He started as an estimator in training. He then began to move up the corporate ladder, first as an assistant project manager, then eventually as a project manager. Callahan Jr.'s project was on Wall Street and that was where he based his operations. Callahan Jr. went to Arc headquarters about once a week to pick up his paycheck from his father. In September 1980 Callahan Jr. was at Arc to get his check. When his dad momentarily left the room Callahan Jr. looked at some papers on Callahan's desk. Although Callahan Jr. had no accounting training, *636 the papers he saw made him believe Arc was in deep financial trouble Concerned about what he saw, Callahan Jr. approached Santorelli. Santorelli told him to "do his homework." Callahan Jr. went back to Arc late one night to do some "nosing around." He was unable to get any information because he did not have a key to get into the records. Santorelli then advised Callahan Jr. to see DeFabritus -- who agreed to get Callahan Jr. a key. Armed with a key Callahan Jr. returned to Arc late one September night, and in the payables he found pink folders which contained a number of invoices and checks. Callahan Jr. made some copies and the next day tried to make a summary of what he had seen. What he had seen was evidence of his father's theft. On Wednesday morning, September 17, 1980 Callahan Jr. approached his father with information which indicated that Callahan had been stealing from Arc. Callahan told his son to "mind his own business." When Callahan Jr. retorted that Arc was his business, Callahan opened his desk drawer, pulled out a gun and threatened to kill Callahan Jr. if he opened his mouth. Callahan Jr. left his father's office and eventually ended up at the home of *637 Edith and Anthony Pope, his aunt and uncle, on September 18, 1980. Callahan Jr. told them of his discoveries at Arc and sought their advice. Anthony Pope told Callahan Jr. he would take care of everything. Four days later, on September 22, 1980, Callahan was forced to resign. Within days Callahan had sold property on Long Island and left town, having stolen millions of Arc's money. Almost exactly six months from the day Callahan's theft was discovered, he was found murdered in Kenosha County, Wisconsin. As helpful and telling as Callahan Jr.'s discovery was, it failed to disclose the benefits received by Minervini or Stinchfield. Further, the benefits showered upon Callahan Jr. as a result of his father's "thievery" were not revealed. Although Callahan Jr. paints himself as Arc's "Knight in Shining Armor," he paints a somewhat distorted picture. It seems that Callahan Jr. had every one of his own needs paid for by Arc. He ordered appliances and video type equipment from David Weiss which Arc paid for and deducted as part of its cost of goods sold. Callahan Jr. had airplane rides from New York City to Montauk paid for and deducted by Arc. Callahan Jr. had monthly bills *638 from Master Card, Visa, American Express, Carte Blanche and Diner's Club credit cards paid for and deducted by Arc. Callahan Jr. also had his gas credit cards paid for by Arc - one of which was jointly in his name and the company's name. Certain of these bills were sent directly to Arc (i.e., the gas card bill in the company's name). Otherwise, when Callahan Jr. received the bill he would give it to his father to pay. Callahan Jr. pleads ignorance to the fact that his father in turn had the credit card bills paid for by Arc. Instead Callahan Jr. claims to have believed his father was only helping him out with his living expenses. Callahan Jr. tells this same story with regard to the appliances and other equipment from David Weiss. Callahan Jr. only "picked-up" new items after getting his father's approval and claims to have believed his father paid for each and every purchase. Callahan Jr.'s story loses a little of its credibility when the facts further indicate that after Callahan left the company in September 1980, Callahan Jr. gave his credit cards bills to his grandfather, Chairman Rao. Again, Rao assigned each bill a job number so that the company would be able to claim *639 the charges as part of its cost of goods sold. As of December 31, 1980, however, Arc had not yet deducted any of the charges that Rao approved. The record is silent as to whether these deductions were taken in subsequent years. We also do not know which job numbers were assigned to the above expenses and in which year or years those jobs were completed. We find that there were at least two distinct plans which diverted funds from Arc. One was Callahan's embezzlement of millions of dollars in cash exclusively for his own benefit. The other plan or plans involved the diversion of funds for personal expenditures that benefitted a majority of Arc's shareholders as well as Arc. The IRS had begun its investigation of Arc sometime before November 1979. In August 1981 the IRS referred this case to the Justice Department. The Justice Department authorized a Title 26 grand jury which joined an ongoing Title 18 grand jury in the Southern District of New York, which was already investigating corruption of electrical contractors in New York City. The grand jury handed down several criminal informations as a result of its investigation. Arc was charged in a four-count information, and *640 Arc ultimately pleaded guilty to 18 U.S.C. § 371 (1976), conspiracy to defraud the United States. This offense specifically charged that Arc had obstructed the lawful governmental functions of the Internal Revenue Service in the assessment and collection of revenue. Arc was fined $ 10,000. Minervini, who was also charged, pleaded guilty to 18 U.S.C. § 371 (1976), conspiracy to defraud the United States. He was sentenced to five years in prison. Three months of the sentence was served; the rest of the sentence was suspended. Stinchfield pleaded guilty to 26 U.S.C. § 7206 (1976), Aiding and Abetting in the Filing of False and Fraudulent Corporate Income Tax Return. He received a three year prison sentence. He served sixty days and the rest of the sentence was suspended. Stinchfield was also placed on probation for five years and ordered to perform community service. DeFabritus pleaded guilty to 26 U.S.C. § 7201 (1976), Tax Evasion. He received a three month sentence which was suspended. DeFabritus was placed on probation for five years. Both Stinchfield and DeFabritus also entered *641 agreements with the United States to pay past taxes. Stinchfield agreed to pay all additional taxes due and owing for the taxable years 1974 through 1979. DeFabritus, on the other hand, agreed to pay a lump sum of $ 150,000 representing the past taxes due and owing. Some of the officers have also worked out agreements to return funds to Arc expended on their behalf. Even though Callahan's murder prevented the imposition of criminal charges, it has not prevented the imposition of a civil lawsuit. In fact, Arc has received a default judgment against Callahan's estate for $ 15,609,820.92. Arc has not filed suit against any other of its employees or officers who received goods or services as part of any of the above-mentioned schemes. In fact, DeFabritus, Santorelli, Faraudo, Minervini and Callahan Jr. are all still employed by Arc. Besides Callahan, Bruno was the only other employee who lost his job because of the schemes and embezzlement. On the day Minervini was released from prison he fired Bruno. OPINION In this case the parties have agreed on adjustments to the 1974 and 1977 taxable years. The case is still before us, however, because respondent has also determined *642 that the deficiencies for those years are due to fraud. Petitioner denies that the deficiencies are due to fraud and also asserts that it suffered an embezzlement loss of over $ 13 million during the 1970's, which it did not discover until 1980. As a result, petitioner claims it is entitled to carry back a portion of its $ 13 million loss to 1977. According to respondent, Arc was operated to allow the director/officer/shareholders and other employees and officers to siphon off unreported income, disguised as corporate expenses. Respondent contends this was not the case of a few employees gone bad; rather many people were involved in these schemes and benefitted from them. Furthermore, the schemes benefitted the company because the diversions improperly inflated the cost of goods sold, thereby reducing Arc's gross profits and its reported tax liability. Respondent also claims that the the diversion of goods, services, and money represented a distribution of Arc's earnings as undeclared shareholder dividends which also escaped corporate taxation. Finally, respondent asserts the officer/shareholders intended to evade both individual and corporate level taxes. Conversely, petitioner *643 asserts that Arc was not a participant in the fraud but a victim of it. Petitioner claims that two of its officers (Callahan and Minervini) wrongfully converted corporate property to their own use; and, while Arc is not entitled to deduct the funds wrongfully converted as part of its cost of goods sold, it is entitled to a deduction for the embezzlement in the year it was discovered. Arc claims to have discovered the embezzlement in 1980, and alleges it is eligible to carry back a portion of the loss to 1977 under section 172. Respondent answers that petitioner's claim of embezzlement is "merely a belated and feeble attempt to escape liability for corporate fraud." Furthermore, since there was no embezzlement Arc is not entitled to a carryback for 1977. Petitioner and respondent appear to argue that each of their positions are mutually exclusive. That is, if we find fraud, there was no embezzlement loss; and conversely, if we find an embezzlement loss, there was no fraud. These positions need not be mutually exclusive. It is possible for the corporation to be involved in a fraudulent scheme and at the same time be the victim of an embezzlement. We find that the fraud and the *644 embezzlement coexisted in this case. In order to better understand our conclusion, we outline each of these items separately. Fraud
Respondent has the burden of proving fraud by clear and convincing evidence for each year he determines the addition to tax under section 6653(b). Sec. 7454(a); Rule 142(b); Shaw v. Commissioner,27 T.C. 561 (1956), affd. 252 F.2d 681 (6th Cir. 1958). We consider the entire record to determine whether fraud exists. Estate of Pittard v. Commissioner,69 T.C. 391, 400 (1977); Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978); Stratton v. Commissioner,54 T.C. 255, 284 (1970). Fraud is not imputed or presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970). Respondent may, however, prove fraud through circumstantial evidence since direct evidence of the taxpayer's intent is rarely available. Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983). In this case, *645 since the taxpayer is a corporation additional rules also apply. A corporation is a separate entity created by law. Since the corporation is an artificial entity, it can only act through its officers, employees and agents. Federbush v. Commissioner,34 T.C. 740 (1960), affd. 325 F.2d 1 (2d Cir. 1963); Ace Tool & Engineering Inc. v. Commissioner,22 T.C. 833, 843 (1954). The wrongful acts and intentions of the corporation's representatives can be imputed to the corporation. Federbush v. Commissioner, supra;Auerbach Shoe Co. v. Commissioner,21 T.C. 191 (1953), affd. 216 F.2d 693 (1st Cir. 1954). Put succinctly, corporate fraud exists if either: (1) the corporate agent so controls the corporation that the corporation becomes the agent's alter ego, or (2) the agent is acting in behalf of the corporation with the result that the corporation actually benefits from the agent's fraudulent acts. Ruidoso Racing Assn. v. Commissioner,476 F.2d 502 (10th Cir. 1973). Arc was incorporated *646 in 1921. Rao, who served as Chairman of the Board during all the years in question, was one of Arc's original founders. Arc was a closely held company and all of the shareholders were related to Rao. All of the directors were also related to Rao. The five corporate directors were Eleanor and William Callahan, Rao's daughter and son-in-law; June and Alfred Minervini, Rao's daughter and son-in-law; and Edith Pope, Rao's third daughter. Not all of Arc's officers were related to Rao. However, during the years in issue Alfred Minervini served as president of Arc; William Callahan served as secretary/treasurer of Arc; until November 1977, Grant Stinchfield, Minervini's son-in-law, served as vice president/secretary of Arc; thereafter Rao's grandson, Callahan Jr., served as secretary. These facts are significant because the fraud which we have determined existed involved and/or benefitted all of the aforementioned officers. The record does not indicate that all of these individuals were involved in one unified plan or scheme; however, that does not change the result in this case. We cannot ignore that Minervini's scheme to have personal living expenses paid by Arc so closely resembled *647 at least the portion of Callahan's scheme to have personal living expenses paid by Arc. Also relevant to our decision is the fact that Rao seemed to be aware of much of the diversion of corporate funds to pay these personal expenses and he either approved of or acquiesced in the corporate expenditures. Petitioner urges that there was no corporate fraud and instead Minervini and Callahan perpetrated a fraud not only on the Internal Revenue Service, but on Arc as well. Petitioner also argues that the shareholders who have suffered this embezzlement should not be punished further by being responsible for the additions to tax for fraud when they were in fact the victims. While we agree that innocent shareholders should not have to suffer by paying additions to tax for fraud when they are in fact the victim of fraud, Asphalt Industries Inc. v. Commissioner,384 F.2d 229 (3d Cir. 1967), we do not believe that all the Arc shareholders, besides Minervini and Callahan, were completely innocent in this case. The portion of this case which relates to Arc's paying for personal expenses *648 of its employees is distinguishable from Botwinik Bros. v. Commissioner,39 T.C. 988 (1963). In Botwinik Bros. v. Commissioner, supra, there was originally one Connecticut corporation with a division in Massachusetts. Eventually the Massachusetts division was incorporated. The Connecticut corporation owned 498 of 750 outstanding shares of the Massachusetts corporation. Two individuals of the Botwinik family each owned one share. Mr. Green, who actively participated in the Massachusetts corporation and served as an officer and director, owned 210 shares. His wife, who was the bookkeeper as well as an officer and director, owned 40 shares. Mrs. Green wrongfully diverted funds from the company for her own benefit. Since she was only a 5.3 percent shareholder, the Court could not find her theft was analogous to a sole or dominant shareholder's merely taking his own money. The Court also stated the result would not change even if the Court assumed Mr. Green was involved in the fraud because it would still result in minority shareholders' acting adversely to the corporation's interest. In this case Rao knew about much of what was going on and *649 approved. He owned 12.33 percent of Arc. Minervini directly benefitted from the scheme and he owned 8.42 percent of Arc. Callahan directly benefitted from the scheme and owned 4.2 percent of Arc. Other shareholders of Arc benefitted indirectly from the schemes as well. June Minervini, who owned 18.27 percent of Arc was benefitted because Arc paid for the construction of an addition to her home. June Stinchfield, who owned 1.09 percent of the company, benefitted because Arc performed work in two of her homes and paid for certain of her utility bills. Elise Kuhnt also benefitted because Arc erroneously paid her husband for architectural plans drawn up for Minervini's house and also paid some of her utility bills. Elise Kuhnt owned 1.09 percent of Arc. Eleanor Callahan benefitted from the scheme because Arc had built several homes in which she lived. Eleanor Callahan owned 22.5 percent of Arc. Finally, Callahan Jr. also benefitted from the schemes since Arc paid for so many of his personal living expenses. Taken in the aggregate, about 69 percent of the shareholders knew of and/or benefitted from the fraud. We do not believe that the benefactors were unaware that Arc paid *650 these expenses, especially since in some cases Arc employees actually performed work on the homes. Therefore, we do not agree with petitioner's contention that 87 percent of the shareholders will have to pay for the wrongdoing of 13 percent of the shareholders. A majority of the shareholders benefitted from the fraud as did the corporation which was able to distribute corporate earnings without a corporate level tax. In our opinion the shareholder who was harmed most by the fraud is Edith Pope. She held over 22 percent of Arc's stock and seems not to have received any part of the corporate earnings which the others received. We also consider the fact that Arc pleaded guilty to conspiracy to defraud the government in determining that Arc is guilty of civil fraud. Our decision in this case centers on the fact that Arc cannot divorce itself from the actions of its officers who knew of, approved of and participated in a fraud which was not contrary to Arc's interests. The decision does not, however, negate the separate embezzlement that William Callahan perpetrated on the corporation. Furthermore, contrary to petitioner's contention, we are satisfied that respondent has carried *651 his burden of proving fraud by clear and convincing evidence for 1977. Respondent has convinced the Court that, at a minimum, prior to and during 1977 Minervini, Stinchfield, Callahan, Rao and Bruno were aware of and/or actively participated in a plan to divert corporate funds. Santorelli, Feraudo and DeFabritus also knew about another plan which diverted corporate funds through false petty cash vouchers. They may not, however, have been aware that so many persons' living expenses were paid by the company. The Court is convinced one or more plans existed during the 1970's which were intended to divert corporate funds. The parties stipulated that the inflated costs of goods sold were attributable to Minervini, Callahan and Stinchfield in 1977. Thus, the scheme was still going on in 1977 and at least a portion of the deficiency, which is not in dispute, was due to fraud. The deficiency for the 1974 taxable year is due to the disallowance of a job credit carryback from 1977. Respondent alleges that since petitioner fraudulently understated its income in 1977 due to overstating its cost of goods sold in that year, it also fraudulently filed a Form 1139 seeking a refund for the *652 1974 taxable year using a jobs credit partially unused in the 1977 taxable year. Respondent claims that since the act of understating income in 1977 was fraudulent the subsequent act of seeking a refund through the use of a jobs credit carryback from 1977 to 1974 was also fraudulent. Petitioner's only defense to respondent's assertion is that there was no fraud. We agree with respondent. Petitioner knowingly understated its income in 1977. It was fraudulent for petitioner to subsequently try to carry back a partially unused job credit which was only unused because of the fraudulent understatement of income. Embezzlement
Section 165 provides that taxpayers are able to deduct any loss sustained during the taxable year which is not compensated for by insurance or otherwise. The deduction for a loss incurred in a trade or business is specifically allowed by section 165(c)(1). Further, section 165(e) provides that theft losses are treated as sustained in the year discovered. Section 1.165-8(d), Income Tax Regs., provides that a "theft" loss includes an embezzlement.
*653 Petitioner bears the burden of proving its entitlement to an embezzlement loss. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Petitioner must prove there was an embezzlement which means it must show that persons to whom money or property was entrusted converted the money or property to their own use. We find that William Callahan embezzled millions of dollars from Arc. We are able to find that this embezzlement coexisted with petitioner's fraud because we also find that Callahan's scheme to steal cash from Arc was a separate and distinct plan from the plan whereby Arc paid for the personal expenses of certain executives. Thus, Callahan's check-cashing scheme is not part of the fraud which we have attributed to Arc. Moreover, even if Arc's payment of personal expenses amounted to a conspiracy, and even if Arc was said to be Callahan's co-conspirator, a party is not held responsible for actions which exceed the scope of the conspiracy. Taxin v. Food Fair Stores, Inc.,287 F.2d 448 (3d Cir. 1961); Occidental Petroleum Corp. v. Buttes Gas & Oil Co.,331 F.Supp. 92 (C.D. Cal. 1971), *654 affd. 461 F.2d 1261 (9th Cir. 1972). Clearly, Callahan's check cashing scheme which netted him alone millions in cash was not anticipated by or approved by Arc or its other executives. Furthermore, this is also a situation in which Callahan's actions were detrimental to and not to the benefit of Arc. William Callahan was involved in a conspiracy with businesses and people outside of Arc. The purpose of the conspiracy was to embezzle cash from Arc for Callahan's benefit, with a commission going to his co-conspirators. Between 1977 and 1980 at least six million dollars was embezzled from Arc using this plan. Petitioner claims that Callahan embezzled $ 15,609,820.92, the amount of its default judgment against Callahan's estate. Arc has recovered a portion of the money but still claims it is entitled to a loss under section 165 of over $ 13 million. We agree that petitioner is entitled to an embezzlement loss, however, petitioner has failed to prove the amount of the loss exceeds six million dollars, an amount respondent's revenue agent admitted Callahan had received in cash. Petitioner presented no solid evidence that petitioner's check cashing scheme pre-dated *655 1977. Petitioner presented testimony of Mr. Laskow, a self-proclaimed forensic accountant, determining that Callahan had embezzled over $ 15 million. We cannot accept that testimony as being accurate. Laskow reviewed records from 1973 forward. Mr. Laskow's determination did not, however, exclude any amounts which we have determined were part and parcel to the corporate fraud. At trial we learned of five companies Callahan used in his check checking schemes. Those companies were Econoby Export Ltd., Econoby Buying Service, Baitinger Electric, Dollar Electric and Central City Electric. Callahan signed checks to these companies between 1973 and 1980. The government's special agent testified that between 1977 and 1980 Callahan withdrew more than $ 6 million in cash using these companies. However, petitioner presented no evidence that any of the checks payable to these companies between 1973 and 1976 were part of the check cashing scheme. It may be that those checks, which totaled $ 352,795.83, were for other things besides removing cash from Arc. Without evidence that the check cashing scheme involved these companies before 1977, we cannot find that Callahan's total embezzlement *656 exceeded $ 6 million. To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are herein incorporated.↩
3. Petitioner suggests that no FICA taxes were due in this instance. We need not decide whether in fact FICA taxes were due because our decision would not be altered even if we assumed petitioner is correct.↩